IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DT BORING, INC, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE CHICAGO PUBLIC BUILDING | ) |
| COMMISSION, HARBOUR CONTRACTORS, | ) No: |
| INC., an Illinois corporation, ENVIRONMENTAL | ) |
| DESIGN INTERNATIONAL, INC., an Illinois | ) |
| corporation, and JOHN DIMOS, an individual, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, DT Boring, Inc. ("DT"), as and for its *Complaint* against defendants The Chicago Public Building Commission ("PBC"), Harbour Contractors, Inc. ("Harbour"), Environmental Design International, Inc. ("EDI"), and, John Dimos ("Dimos") states as follows:

### Parties

1. Plaintiff, DT Boring, Inc. ("DT") is an Illinois corporation, with its principal place of business located at 9828 Pheasant Ridge Road, Portland Michigan.

2. At the time of the events at issue here, DT was engaged in the business of consulting on geothermal energy, as well as designing, drilling and installing geothermal well fields and geothermal heating and ventilation systems for governmental, commercial and residential structures.

3. DT is owned in joint tenancy by, *inter alia*, Tom Shelton ("Shelton") and his wife Dawne.

4.   Shelton is a fourth generation "driller" and his sons, Jess and Kyle, represent the fifth generation.

5.   Shelton not only grew up in the nearly-century old, traditional Shelton family business of drilling water wells, but he subsequently spent time and trained with major oil companies Exxon, Sohio, Leed Oil & Gas, Chevron, British Petroleum, as well as with Otis Engineering, a Halliburton subsidiary.

6.   Shelton also founded United Well Tester, Inc. in 1982, and worked alongside "Boots & Coots," – since 2010, also a Halliburton subsidiary – but originally founded in 1978 by Red Adair's lieutenants, becoming Adair's Oil Well Fires' main competitor in controlling, extinguishing, and cleaning up after oil and gas well fires.

7.   Otis Engineering is also a creator of oil and gas completion equipment.

8.   Consistent with his drilling experience, particularly with Otis Engineering, Shelton is both the creator of a patented process known as "Urban Drilling Methodology"$_{SM}$ ("UDM$_{SM}$"), and the inventor of numerous devices necessary to and/or employed both in that process, as well as generally in the drilling industry.

9.   Defendant Chicago Public Building Commission ("PBC") is a municipal corporation that controls and oversees the construction and renovation of schools, libraries, police and fire stations, and other public buildings as the owner, and/or agent for, *inter alia*, the City of Chicago, Cook County, the Chicago Transit Authority, the Chicago Park District and the Chicago Public Schools.

10.   The PBC was created and exists pursuant to the Illinois Public Building Commission Act, 50 ILCS 20/1, *et seq.*

2

11.     The PBC is headed by the Mayor of the City of Chicago, and it is the owner of the 12th District Police Station, the project at issue in this dispute ("the Project").

12.  The PBC takes its projects from the planning and architectural design stages through the bidding and actual construction stages until completion, awarding approximately $250 million in contracts each year.

13. Although the PBC's bidding process for general contractors to handle the PBC's projects is supposed to be open and fair, in practice the same relatively small group of general contractors consistently win the PBC contracts.

14. The reason for this uniformity is that the "regulars" substantially underbid the PBC-offered contracts by reducing to a bare minimum, or eliminating their own profit margins altogether in their bids with the knowledge that they will recoup their profits through various fraudulent and/or extortionate schemes to arrogate their subcontractors' profits to themselves, and in some cases – as with defendant Harbour as set forth below – the payment of their subcontractors' actual costs, thereby leaving their subcontractors "broke before they start, " as was reported in the May 14, 2012 issue of *Crain's Chicago Business*.

15. This "under bidding" process excludes all of the legitimate, potential general contractors (because they include in their bids a reasonable profit margin for themselves and their subcontractors) and it ensures that only the few "regulars" will be general contractors on PBC projects.

3

16. For example, *Crain's* investigated 63 PBC contracts issued from 2008 to early 2012 totaling approximately $1 billion, and reported in its May 14, 2012 issue that $736.4 million, or 73 percent of those contracts went to just three companies: F. H. Paschen/S.N. Nielsen, Inc., George Sollitt Construction Co. and Walsh Construction Co.

17. *Crain's* further reported that, although 25 companies bid on the 63 projects that it reviewed, the PBC awarded Paschen a total of 18 projects worth $321.6 million — nearly one-third of all PBC contract dollars during that four-year period.

18. According to *Crain's*, Paschen was second in the bidding five times during those four years, while PBC awarded Sollitt and its joint ventures 11 contracts valued at $308.6 million.

19. *Crain's* determined that, of PBC's "usual" contractors, Walsh was third with $106.2 million in PBC contracts since 2008, but PBC had already awarded Walsh $200 million in projects in the early 2000s, including seven contracts for Millennium Park.

20. *Crain's* reported that among the handful of remaining PBC general contractor "regulars" are James McHugh Construction Co., located in Chicago's South Loop, with a PBC-awarded $53.7 million land development contract for the 31st Street Harbor; and defendant Harbour Contractors Inc.

21. Defendant Harbour Contractors, Inc. ("Harbour") has a long history of construction activities for the City Chicago beginning in 1990 when it was given a

10-year engagement as construction program manager for the City's Department of Aviation in charge of all construction at all of Chicago's airports.

22. Harbour also acted as PBC's general contractor on at least two Chicago Police Department stations worth a total of $52.3 million: the 23rd District Station in 2008, and the 12th District Station, which is at issue in this lawsuit.

23. Consistent with the pattern of conduct of PBC's other general contractors, on information and belief, Harbour expected to make up its profit margin by extorting and defrauding its subcontractors and materialmen out of the payments for the work and the materials that those subcontractors and materialmen had actually performed and supplied for the benefit of Harbour and the PBC.

24. These defrauded subcontractors and material men include, without limitation, Unilock Chicago, Garth Construction Services, TGM Fabricating, Inc., Escarpita Construction Company, BSB Development, Inc., Glass Designers, Inc., Briar Patch Landscaping, Inc. and Quality Control Systems – all of whom sued Harbour and the PBC in the Circuit Court of Cook County for nonpayment on the Project – as well as DT.

25. Defendant Environmental Design International, Inc. ("EDI") is an environmental consulting and design firm that PBC consistently, if not exclusively, uses whenever environmental issues arise on any of PBC projects.

26. As explained below, in order to satisfy PBC, a major customer, on information and belief based on the facts set forth below concerning EDI's actions regarding asbestos contamination on the Project site, EDI states whatever is necessary to

5

protect the PBC's position, regardless of the potential harmful effects on subcontractors to PBC's general contractors.

27. Defendant John Dimos ("Dimos") is also an environmental consultant.

28. Dimos was hired by Harbour to prepare a plan for dealing with asbestos which DT discovered on the Project site on August 31, 2011 after Shelton, his two sons, and other DT employees had been working in the blowing asbestos dust for two weeks.

29. As described below, on information and belief, in order to get DT's employees working again because Harbour was approximately 2 months behind schedule due to DT's discovery of the asbestos, Dimos prepared a fraudulent site assessment falsely stating that there was no friable asbestos, *i.e.*, asbestos capable of crumbling and becoming airborne in dry weather, on the Project site.

## Jurisdiction and Venue

30. This Court has jurisdiction over this matter pursuant to 18 U.S.C. §1964(c).

31. This Court has jurisdiction over DT's state law claims pursuant to 28 U.S.C. §1367 in that they form part of the same case or controversy as DT's claims under 18 U.S.C. §1962.

32. Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that defendants all reside in this judicial district, and a substantial part of the events or omissions giving rise to DT's claims occurred in this judicial district

33. This Court has personal jurisdiction over the PBC in that, at all relevant times hereto, the PBC has resided, and has transacted business in this judicial

6

district, and because the PBC is the owner of the 12th District Police Station, the
project at issue in this dispute ("the Project").

34. This Court has personal jurisdiction over defendants Harbour, EDI, and
Dimos in that, at all times relevant hereto, those defendants have resided, and have
transacted business in this judicial district as, respectively, the Project's general
contractor, the PBC's environmental consultant and Harbour's environmental
consultant.

## COUNT I – RICO CLAIM (18 U.S.C. §1962(b)) – HARBOUR, EDI and DIMOS

35. Plaintiff DT repeats and realleges ¶¶ 1-34 as though the same were fully set
forth herein as ¶ 35 of Count I.

### The RICO Enterprise

36. The PBC (which is immune as a matter of law from RICO claims) heads, and
controls an association-in-fact RICO enterprise comprising a second tier of a small
group of "preapproved" general contractors such as F. H. Paschen/S.N. Nielsen, Inc.,
George Sollitt Construction Co., Walsh Construction Co., James McHugh
Construction Co., and Harbour, as well as regular consultants such as EDI.

37. Because the PBC has set aside a portion of the work on its projects to be
awarded to minority and/or women-owned businesses, for most projects, there is
also a third tier consisting primarily of another small group of alleged minority or
women-owned "subcontractors" such as Fullerton Industrial Supply, E. E. Bailey
Building Materials & Supplies and Garth Building Products/Garth Construction
Services who are hired by the general contractors because of their purported

7

minority and/or woman owned status.

38. The goal of the enterprise, through fraud and extortion, is to benefit the PBC by constructing and/or renovating public buildings in this judicial district at, or below their actual construction cost while enriching both the second tier general contractors, and the third tier minority/woman owned subcontractors at the expense of the bottommost project subcontractors.

39. As described in *Crain's* May 14, 2012 issue by John Luckett of Glass Designers, Inc. – a company that had worked on approximately six PBC projects since 2008 – "The system is set up for corruption at the top, and at the bottom it's set up for legitimate minority businesses to ultimately fail."

## Defendants' Pre-12th District Pattern of Racketeering Activity

40. Although the participants, particularly the general contractor may vary from project to project, the participants' *modus operandi* follows the same pattern.

    a. PBC requests bids on a project from potential general contractors;

    b. the general contractors, which includes those who are members of PBC's RICO enterprise, in turn, request preliminary bids, sometimes directly from legitimate minority and nonminority contractors, and other times through the third-tier "two per centers;"

    c. The "two per centers," who are also members of PBC's RICO enterprise, request bids from their subcontractors;

    d. the lower tier subcontractors submit their bids, including a reasonable profit margin;

8

e. frequently, but not always, the general contractors, with the undisclosed, fraudulent intent to benefit the PBC by having the overall project brought in at, or below actual construction cost (which also ensures that the RICO enterprise general contractor will be the lowest bidder because of the legitimate contractors' inclusion in their bids of both their own and their subcontractors' profit margins) then demand that the lower tier subcontractors reduce their bids in order to be included in the general contractor's overall bid;

f. afraid to lose the work – particularly after the construction industry began slowing in 2006, and came to a virtual halt in late 2007-early 2008 at the beginning of the Great Recession – the lower tier subcontractors reduce or eliminate their profit margin with the hope that at least they will be able to pay their employees a while longer, and cover their rent, utilities and other overhead even if they do not make a profit;

g. once the PBC awards the project to one of its RICO enterprise general contractors, those general contractors face the dual tasks of: 1) ensuring that the project finally *is* brought in at, or below actual construction costs to benefit, and to fulfill their bargain with PBC; and ii) regaining their own profit margins that they intentionally and fraudulently omitted from their bids. They fulfill those tasks by extorting funds and performance from the lower tier subcontractors by, *inter alia*:

   i) refusing to process change orders approving work performed

9

outside the scope of the original contracts and subcontracts so that
PBC gets the benefit of additional work and materials for free;
and/or

ii) trumping up phony "back charges" for the subcontractor's
purportedly defective work so the general contractor can withhold
the amount of those fraudulent back charges; and/or

iii) refusing to pay the subcontractor's 10% retainage when due;
and/or

iv) simply refusing to pay the subcontractor at all; and/or

v) agreeing to pay the retainage, change orders and/or amounts
due, but *only* if the subcontractor agrees to a "buyout" which is a
reduction in the amount owed to the subcontractor.

**Subcontractors Are Forced Out Of Business by the PBC's RICO Enterprise
General Contractors' Delayed or Non-Payment**

41. Often, PBC's RICO enterprise general contractors simply squeeze the
subcontractors out of business by delaying payment so long that the subcontractors'
businesses fail altogether simply because they can no longer afford to "finance" the
PBC's construction projects indefinitely, and, on information and belief, the PBC
ends up paying little or nothing on the amounts owed to the subcontractors because
they are no longer in business.

42. Examples of companies forced out of business by the PBC and its RICO
enterprise general contractors' deliberate delays in payment include TVS

10

Mechanical, a minority-owned heating and air conditioning company, forced out of business after 18 years' existence, and Carlo Steel, a Latino steel fabricator, both of which worked under PBC's RICO enterprise general contractor Paschen on the Gwendolyn Brooks College Preparatory Academy.

43. On the 12th District Police Station at issue here, Harbour (which directly controls the RICO enterprise from its general contractor level downward) followed precisely the same pattern: approximately one year into the construction, the PBC's and Harbour's delays in payments had already forced out of business a minority concrete subcontractor owned by Julius Delgato, and later, as described below in more detail, the PBC's and Harbour's delayed payments forced plaintiff DT out of business.

> ### Even Surviving Subcontractors Are Damaged by the PBC's RICO Enterprise General Contractors' (Including Harbour's) Delayed- and Non-Payment of Change Orders and Retainage

44. Among pre-12th District Police Station Project examples of PBC's and its RICO enterprise general contractors' refusal to process the lower tier subcontractors' change orders in a timely fashion and/or to pay the lower tier subcontractors *at all* (although *these* subcontractors managed to survive as companies) are: D & P Mechanical ("D & P") which is still owed approximately $18,000-$20,000 for its work on the Chicago Fire Department station located at 6030 N. Clark St., Chicago, Illinois; a project on which the PBC's RICO enterprise, general contractor Castle Construction Corp. was the general contractor.

11

45. The last request for a PBC payment on the 6030 N. Clark St, Chicago Fire Department station was made in September, 2008; more than seven years earlier, and it did not include *any* request for payment of D & P's amounts due and owing.

46. On information and belief based on the sheer passage of time, the PBC has no intention of paying D & P for the benefits that D & P conferred upon the PBC and that results in the fraudulent deprivation of D & P of its labor and material expenditures for the project in the amount of approximately $18,000-$20,000.

47. That project-savings, multiplied by 20 to 30 subcontractors (at least) on a project means that the PBC saved at least $360,000 to $400,000 on the project by stealing that amount from the project's subcontractors.

48. Consistent with the PBC's and its RICO enterprise general contractors' pattern of RICO activity, four years after not being fully paid on the 6030 N. Clark St, Chicago Fire Department station, D & P still agreed to work on the 12th District Police Station at issue in this litigation.

49. D & P subsequently submitted 23 change orders to Harbour and the PBC between January and late-August, 2012, but only *four* were ever approved, leaving a remaining, outstanding balance owed to D & P for its change orders and retainage of approximately $470,000 that has yet to be paid three years after D&P finished its work on the Project.

50. Similarly, it was not until December, 2013 that Harbour finally paid Metropolitan Steel, Inc. of Lansing, Illinois ("Metropolitan") only a percentage of Metropolitan's $9000 change order on the 12th District Police Station.

51. Moreover, approximately 1½ years after completing its work on the 12th District Police Station, Metropolitan pushed Harbour for payment of the final $60,000 still owed to Metropolitan on the 12th District Police Station, but Harbour tried to claim that Metropolitan was owed only $5000 because, Harbour told Metropolitan, Harbour had a $55,000 back charge from another subcontractor for purportedly correcting Metropolitan's improper work on the Project even though Metropolitan had never been informed of any claim that its work was improperly performed either while it was still on the job, or in the ensuing 1 ½ years.

52. Metropolitan's subsequent investigation revealed that the back charge was phony and had nothing to do with any work that Metropolitan performed on the Project.

53. On information and belief based on the overall conduct of PBC and its RICO enterprise general contractors, specifically including Harbour, Harbour will attempt to reduce or eliminate D & P's change orders and retainage payment through either or both a buyout, or another phony, back charge, or it will simply not pay the change orders and retainage at all.

54. Further examples of the PBC's RICO general contractors' use of phony, back charges to reduce or eliminate the lower-tier subcontractors' change orders – as, upon information and belief, will happen with those of Metropolitan and D & P on the 12th District Police Station – are the change orders of Glass Designers, Inc. ("Glass Designers") which is currently suing the PBC and Harbour on those charges in the Circuit Court of Cook County.

13

55. Prior to the 12th District Police Station, Glass Designers also worked as a subcontractor along with D & P on the fire station located at 6030 N. Clark for which PBC's RICO enterprise general contractor was Castle construction.

56. Castle had directed Glass Designers to perform some additional work in or around April, 2007 so that by September, 2008, the change order payment had been pending for nearly a year and a half after the work had been completed when Castle rejected the change order, refused to pass it on to the PBC, and then issued its own back charge order for purported deficiencies in Glass Designer's work that canceled out Glass Designer's change order so that the PBC's website (on which project payments to its RICO enterprise general contractors, and at least the second tier subcontractors are publicly posted for purported "transparency" purposes) shows less than the full amount due.

57. The net result is that Glass Designers has never been paid, and will never be paid for the work represented by the change order, while the PBC got the work performed for free, and Castle performed one of its tasks under its general contract with PBC which is to make the total cost of the projects both appear to be, and actually be artificially low.

58. Similarly, Glass Designers was also a subcontractor on the PBC's Powell Replacement Elementary School Project, and when it requested its final payout of $2000 in or around September, 2011, PBC's RICO enterprise general contractor Sollitt, issued a $1765.00 charge back, change order for work allegedly done by

14

another subcontractor a year earlier, in or around September 2010, supposedly to correct drywall defects caused by Glass Designers.

59. Just as Harbour treated Metropolitan's change order on the 12th District Police Station project, Glass Designers was never given notice of any purported defects in its work, and it was never given any opportunity to correct any alleged defects, the whole issue being concealed from Glass Designers by Sollitt for a year before being used to reduce Glass Designers's final payment to only $235 on June 19, 2012.

60. Glass Designers also worked on the PBC's Collins High School Campus Renovation Project for which the PBC's RICO enterprise general contractor was IHC Construction Companies, LLC ("IHC").

61. On or around August 2, 2012 IHC began asking Glass Designers to provide its two-year warranty for its work on the project, originally only a $36,000 contract for Glass Designers.

62. In response, Glass Designers pointed out that it was still owed payments on two change orders, one for $303.95 and the other for $5385.00 for work that had been done a year earlier.

63. IHC answered that it was still getting approvals of change orders from PBC from as far back as October, 2011; "[y]ou know the way [PBC] operates," and on September 6, 2012 IHC finally sent Glass Designers approvals for the two year-old change orders, but the approvals were accompanied by a charge back, change order for $1371.00, also dated September 6, 2012, and again for work allegedly done a

15

year earlier by IHC, itself, purportedly to repair part of Glass Designers' work, but about which Glass Designers was never informed, and which it would have corrected for free under its own warranties.

64. IHC simply skimmed $1371.00 – more than 3% of Glass Designers's total contract price (including all change orders) – that actually belongs to Glass Designers.

### Defendants' Pre-12th District
### Predicate Racketeering Acts Under 18 U.S.C.A. §1964

65. Although many of these individual amounts taken from individual, lower tier subcontractors are relatively small, there are typically 100 to 200 second tier and lower subcontractors on most PBC projects so that $2000 to $20,000 extorted or fraudulently pilfered from each of so many subcontractors quickly adds up and replaces the general contractors' profit margins that they give up when bidding the PBC's projects to eliminate legitimate contractors whose higher bids properly include their own profit margins.

66. The obtaining of these funds from the lower tier subcontractors by PBC and its RICO enterprise general contractors has violated and continues to violate 18 U.S.C.A. §1951 ("the Hobbs Act") because the subcontractors' consent-through-acquiescence to the funds' taking is, and was induced by PBC's and its RICO enterprise general contractors' wrongful use, and exploitation of the subcontractors' reasonable fears of financial and economic loss and injuries to their businesses from, *e.g.*, being excluded from PBC's future projects (even on a break-even basis at

16

a time when the construction industry is desperate for *any* work just to cover the costs of staying in business), and/or having even more funds withheld in retaliation for objecting to the taking of the smaller amounts as occurred with DT.

67. The obtaining of these funds from the lower tier subcontractors by PBC and its RICO enterprise general contractors also violates 18 U.S.C.A. §1951 ("the Hobbs Act") because the subcontractors' consent-through-acquiescence to the funds' taking was, and is wrongfully induced by PBC and its RICO enterprise general contractors under color of PBC's official right because it is being done through, and in connection with PBC's ownership and management of public construction projects.

68. The PBC's and its RICO enterprise general contractors' wrongful actions obstruct and affect interstate commerce in that the construction materials used by the subcontractors (and for which they may or may not be paid at the whim of PBC and its RICO enterprise general contractors) such as concrete, bricks, wiring and other electrical apparatus, pipes, HVAC duct work, furnaces and air conditioning units all move through interstate commerce.

69. Additionally, the subcontractors themselves, such as DT, frequently come from other states to work on these projects, typically Indiana and Michigan.

70. For example, according to the PBC's own public records, the PBC's 23rd District Police Station – for which Harbour was the general contractor – had five non-Illinois subcontractors and PBC's 12th District Police Station at issue here had three non-Illinois subcontractors.

17

71. PBC's and its RICO enterprise general contractors' wrongful conduct also has violated and continues to violate 18 U.S.C.A. § 1341 ("the mail fraud statute"), and18 U.S.C.A. § 1343 ("the wire fraud statute") in that, for each project, the PBC and its RICO enterprise general contractors, and PBC's RICO enterprise general contractors' subcontractors, such as Optimal, and their second tier, subcontractors, such as DT, transmit and receive among each other, and with subcontractors, material men and third parties (such as the Occupational Safety and Health Administration ("OSHA") and the Illinois Environmental Protection Agency ("IEPA")), *e.g.*, bid requests, bids, contracts, change orders, reports, and general communications through both the US mail and over the interstate wires in the form of both emails, and emails with attachments in connection with the PBC's and its RICO enterprise general contractors scheme to defraud the lower tier subcontractors.

72. As set forth above, the scheme to defraud consists of inducing prospective lower tier subcontractors to enter into contracts to provide their labor, services and materials for PBC's projects, at supposedly fixed contractual prices, by deliberately and intentionally misrepresenting to those prospective subcontractors through the PBC's bid solicitation materials that its public projects are actually legitimate business opportunities when the PBC's and its general contractors' actual intent is to deprive the subcontractors of most, if not all of their profits, and frequently, some or all of the payments for their costs.

73. The scheme includes fraudulently inducing those lower tier subcontractors to

18

provide additional labor, services, and materials for the projects with the fraudulent promise of additional payments through change orders that the general contractors never submit to PBC for payment, or submit with a "wink and a nod" with PBC, both knowing that PBC will never approve the change orders, or which are reduced to little or nothing through charge backs from the RICO enterprise general contractors so that PBC brings in the public projects at, or below their actual costs while its RICO enterprise general contractors are wrongfully enriched from payments lawfully due to the lower tier subcontractors.

**DT's Victimization With PBC's 12ᵗʰ District Police Station Project**

**The Undisclosed Underground Obstructions**

74. On October 12, 2010, Shelton received, at DT's Michigan principal place of business, an emailed, abbreviated version of the PBC's bid documents for the 12ᵗʰ District Police Station located at 14ᵗʰ St. and Blue Island Avenue in Chicago, Illinois ("the Project") sent by Neil Piazza ("Piazza") of Optimal Energy, LLC ("Optimal").

75. On or about March 4, 2011, Piazza provided Shelton with a draft subcontractor's agreement identifying Optimal as the "contractor" and DT as the "subcontractor" for, *inter alia*, performing the drilling of 88 geothermal boreholes, the installation and the grouting of ground loops in each of the 88 boreholes, and the connection through trenches to be dug by DT of the ground loops to pressure-equalizing vaults that, in turn, connected to the heating, ventilating and air conditioning ("HVAC") system for the police station.

19

76. Also enclosed with the draft subcontractor's agreement were revised plans for the geothermal portion of the Project taken from the PBC's bid documents for the Project.

77. The PBC's revised bid documents included a change to ¶ A of Part 1.6 of "Book 3A, Technical Specification, SECTION 00201, Part 1-General" of the Project's construction plans and specifications on which contractors and subcontractors relied when preparing and submitting their bids to the PBC for the Project.

78. The revised ¶ A, titled "Site History", stated:

> Historical records indicate that the site has contained a mix of residential, commercial and manufacturing companies. Residential buildings were removed in December 2009 to clear the site for plan construction of the 12th District Police Station. *Remaining subsurface structures were removed in April 2010 as part of the site preparation work for the construction of the 12th District Police Station.* (Emphasis added).

79. Revised ¶ A of Part 1.6 was false on its face.

80. The Project site, indeed, had previously been occupied by a multi-building, low rise, low income, Chicago Housing Authority ("CHA") public housing project with steam heat supplied to the individual units from at least two central furnaces connected to the units through underground steam pipes.

81. Contrary to the PBC's statement in revised ¶ A of Part 1.6, however, the "remaining subsurface structures" from the public housing buildings had *not* been removed.

82. In fact, numerous, steel rebar-reinforced, concrete foundations from those buildings remained buried on the site several feet below grade, and undetectable through any visual inspection of the Project site.

83. Also buried several feet below ground and undetectable through any visual inspection of the Project site were numerous asbestos-wrapped steam pipes that had previously connected the public housing residences to a central boiler room for the housing development.

84. Shelton and DT relied on the PBC's false statement in revised ¶ A of Part 1.6 that "[r]emaining subsurface structures were removed in April 2010 as part of the site preparation work for the construction of the 12th District Police Station" when preparing and submitting DT's revised bid of $830,000 to be the second-tier subcontractor performing most of the geothermal work on the Project.

85. Based on ¶ A of Part 1.6 DT prepared its bid as though the Project site was free of all underground obstructions that could add additional drilling costs because of, *inter alia*, damaged drilling equipment requiring repairs and/or the cost of additional time needed to relocate drill rigs when obstructions were encountered so that the boreholes could be drilled in a location without any such impenetrable obstructions.

86. On April 6, 2011, Shelton received, what purported to be final site plans for the Project from Gary Birman of Optimal at DT's Michigan's principal place of business through the United States mail.

87. These purported final site plans did not reveal anything new concerning the

21

undisclosed, underground obstructions or the buried asbestos.

88. Six days later, on April 12, 2011, Optimal forwarded to Shelton, at DT's Michigan's principal place of business, an email from Lisa Fricker of Harbour – PBC's RICO enterprise general contractor for the Project – notifying various subcontractors, including Optimal, that there was to be a meeting the following Tuesday, April 19, 2011 at the Project site concerning the geothermal and rainwater harvesting systems for the Project.

89. Fricker's April 12, 2011 email stated that the subcontractors, including Optimal, were to bring with them their installers, *i.e.* DT (which had been actively negotiating with Optimal for approximately a month to become its subcontractor for the Project).

90. Subsequently, on April 25, 2011. Sanjiv Pillai ("Sanjiv") of Optimal forwarded to Shelton, at DT's Michigan's principal place of business, emails of April 12 and April 25, 2011 (again from Harbour's Lisa Fricker) informing various subcontractors, including Optimal, that there was a Commissioning Kick-off meeting at the Project site on April 26, 2011 and stating that attendance was mandatory.

91. Meanwhile, DT continued negotiating with Optimal to become Optimal's subcontractor on the Project, *inter alia,* to perform the geothermal drilling, the installation of loops and vaults, as well as the trenching for, and installation of the connecting piping between the vaults.

92. Pursuant to those negotiations, on or about May 5, 2011 DT entered into a second tier subcontract with Optimal which, by then, had a subcontract directly with defendant Harbour.

93. DT began its work immediately after signing the Optimal contract, but within days, still in early May, 2011, DT encountered the first of the underground steel rebar-reinforced underground obstructions.

94. As a result, Shelton immediately notified Sam Rae ("Rae") Harbour's Project Manager for the Project, explaining that the obstruction had not been disclosed on any of the bid documents given to Shelton and although, DT could have drilled through ordinary concrete foundation footings, *no* drill rig could drill through rebar-reinforced concrete footings.

95. Rae disappeared into Harbour's trailer/office and approximately 45 minutes later, LeeAnn Tomas-Foster ("Tomas-Foster"), the PBC's Deputy Director for Environment arrived at the Project site.

96. There followed an on-site meeting with Tomas-Foster, James Harrell ("Harrell"), the PBC's then-Project Manager, Andy Horn ("Horn") who was the PBC's Assistant Project Manager for the Project, and Rae ("Rae").

97. No one from Optimal was present although Optimal, not DT, was Harbour's subcontractor for the bid portion of the Project's geothermal installation.

98. Shelton showed Tomas-Foster, Harrell, Horn and Rae what DT's drilling crew had encountered, and Shelton explained again that drilling rigs cannot penetrate steel rebar-reinforced concrete.

23

99. Shelton suggested as a solution that, if DT encountered any additional undisclosed, rebar-reinforced foundation footings, then DT should be allowed to relocate its drilling rigs anywhere within a 2-foot radius of the original, specified location for the borehole as shown on the Project plans so DT could avoid the foundation footings below the designated borehole location.

100. Rae and the PBC personnel agreed to Shelton's suggestion and told Shelton they would seek formal approval from the Project's architects.

101. That agreement was reached directly with DT through Shelton, but without Optimal's participation as an intermediate subcontractor between DT and Harbour.

102. Immediately following the meeting, Tomas-Foster spoke briefly with Shelton, telling him that the PBC also could not "guarantee" that DT would not encounter "utility lines" while drilling and digging trenches on the site.

103. At that time, it was already apparent that there were old gas lines still on the site because Harbour previously had removed the top 18 inches of soil in and around the geothermal well field, exposing a number of those gas lines which could be seen from where Shelton and Tomas-Foster were standing.

104. Consequently, Shelton asked Tomas-Foster what kind of utility lines she meant, but Tomas-Foster refused to answer the question.

105. A review of Tomas-Foster's April 23, 2015 deposition taken in *Harbour Contractors, Inc.* v. *Optimal Energy, LLC*, 13 L 2975 (pending in the Circuit Court

24

of Cook County, Illinois), makes it apparent that Tomas-Foster was referring to the asbestos-wrapped steam lines which Tomas-Foster knew were also still on site.

106.     According to Tomas-Foster's April 23, 2015 deposition in *Harbour Contractors, Inc.* v. *Optimal Energy* – including a September 29-30, 2011 email thread with emails to, from and among Tomas-Foster, Horn and defendant EDI's Scott Dileto ("Dileto") marked as Exhibit 11 to Tomas-Foster's deposition – months before the CHA residents on the Project site had vacated the buildings so that they could be demolished, Tomas-Foster and Dileto had received a site plan from the CHA showing the asbestos-wrapped steam lines.

107.     Further according to Tomas-Foster's April 23, 2015 deposition and exhibits to that deposition, in or around April, 2009, Tomas-Foster and Dileto had visited the Project site, and had agreed that EDI would do environmental test borings around the Project site looking for contaminated soil, but that the test borings would deliberately avoid coming near the underground, asbestos-wrapped steam lines.

108.     Additionally, EDI had hired a subcontractor to do an electromagnetic ("EM") analysis of the Project site and the resulting diagram was included in Project Book 3C (which was part of the Project plans and bid documents) as part of the Phase II Environmental Assessment section of the Project plans.

109.     The EM analysis recorded 36 underground "anomalies" and recommended doing test boring to determine what each of the anomalies were, but Tomas-Foster and Dileto agreed that EDI would do test borings near only 17 of the

36 "anomalies", on information and belief, to avoid "discovering" the underground, asbestos-wrapped steam lines..

110.     EDI's EM diagram also contained a few entries labeled "possible utility lines", but the diagram gave no indication that any of the "possible utility lines" were actually asbestos-wrapped steam lines as, on information and belief, was already known to the PBC through Tomas-Foster and to EDI through Dileto from the CHA plans already provided to them.

111.     Tomas-Foster's April 23, 2015 deposition also revealed for the first time to DT that the PBC, at least through Tomas-Foster, and EDI, through Dileto, continued active, on-site involvement with the preparation of the Project site for construction beginning again at least in January, 2010 when all residents had been moved out and the CHA buildings had been demolished.

112.     At that time, January 2010, EDI conducted additional test borings on the Project site, with oversight from Tomas-Foster who was on site for at least part of the test borings.

113.     On information and belief based on the direct involvement of the PBC both before and after its acquisition of the Project site, its possession of the CHA's site plans showing, *inter alia*, the underground, asbestos-wrapped steam lines, and the PBC's monitoring and involvement in the demolition of the CHA housing and the preparation of the Project site for construction of the 12th District Police Station, all revealed to DT for the first time in the transcript of Tomas-Foster's April 23, 2015 deposition, the PBC was fully aware of both the asbestos-wrapped steam

26

pipes, and of the existence and location of all of the steel rebar-reinforced, underground obstructions that DT encountered during its work on the Project.

114.     Nevertheless, the PBC and EDI did not disclose the material facts of the existence of either the asbestos-wrapped steam pipes, or the underground obstructions in any of the bid documents, including the Project plans on which DT reasonably relied when bidding for, and conducting its geothermal drilling and trenching activities for the Project.

115.     Indeed, directly contrary to the PBC's and EDI's actual knowledge of the underground obstructions, as stated above, the PBC's revisions to ¶ A of Part 1.6 of "Book 3A, Technical Specification, SECTION 00201, Part 1-General" of the PBC's Project construction plans and specifications expressly stated:

>      Historical records indicate that the site has contained a mix of residential, commercial and manufacturing companies. Residential buildings were removed in December 2009 to clear the site for plan construction of the 12th District Police Station. *Remaining subsurface structures were removed in April 2010 as part of the site preparation work for the construction of the 12th District Police Station.* (Emphasis added).

116.     The day after the on-site meeting of Shelton, Tomas-Foster, Harrell, Horn and Rae when DT had encountered the first of the undisclosed, underground obstructions, Horn asked Shelton what it would cost "us" – meaning the PBC – for DT to relocate its drilling rigs when DT encountered the undisclosed underground obstructions.

117.     Shelton explained that every time that DT had to move a drilling rig to a new location to avoid the undisclosed, underground obstructions, it would take a minimum of 2 to 2 ½ hours of time, but if DT encountered another undisclosed underground obstruction when it began drilling in the new location, then DT would have to relocate the drilling rig again.

118.     To fully answer Horn's question, Shelton went to his truck for a calculator, and after a few minutes, Shelton told Horn that because of the variations in actual time, DT would charge a flat three hours of time (no matter how long the relocations actually took) at a cost of $1650 for each such drilling rig relocation, plus an additional cost for the removal of excess "spoils," *i.e.,* soil, that needed to be trucked away from the Project site.

119.     Horn agreed to the costs as stated by Shelton, again without the participation of Optimal as the intermediate subcontractor between DT and Harbour.

120.     On or about May 26, 2011, Shelton received an email over the interstate wires that contained another email, also sent over the interstate wires, dated May 17th, 2011, and sent from Horn to Harrell, and other PBC staff members expressly authorizing DT to relocate its drilling rigs a maximum of 2 feet in any direction in order to avoid undisclosed, underground obstructions.

121.     The email serves as an express acknowledgment of PBC's knowledge of the relocation issue, as well as PBC's express, written authorization, approval for, and agreement with DT to perform the additional work.

28

122.     Shortly thereafter – still in or around early June, 2011, and on the Project site – Shelton asked Harbour's Rae why DT was not receiving written Field Orders from Harbour for the drill rig relocations caused by the undisclosed, underground obstructions because the field orders should have been forthcoming after Harrell, Horn, and Rae had authorized DT's drill rig relocations given by during the initial, May, 2011 on-site meeting.

123.     Rae responded that Harbour had not issued any Field Orders because Harbour had to "package" DT's drill rig relocation costs as change orders with *other* subcontractors' change orders, before submitting them all to the PBC for payment.

124.     Rae told Shelton again that DT would be paid for its drill rig relocation costs, and he also told Shelton to have DT continue with its work including relocating the drill rigs when necessary because of undisclosed, underground obstructions.

125.     DT continued drilling the remainder of the 88 boreholes for the Project, relocating its drill rigs when necessary to avoid undisclosed, underground obstructions, doing so in reliance on: i) Rae's statements that DT should continue with the relocations and would be paid for its extra costs not included in DT's bid because the bid documents had stated that all those underground obstructions had been removed more than a year earlier to prepare the site for the Project's construction; ii) the original May, 2011 on-site agreement of Shelton, Harrell, Horn, and Rae that DT should relocate its drilling rigs when necessary because of the undisclosed, underground obstructions; iii) Horn's approval of DT's charging a flat

29

three hours' worth of time and expenses for each relocation; and on iv) the May 17, 2011 email from Horn to Harrell that was forwarded by email to Shelton on May 26, 2011, all directing DT to continue with its drill relocations.

126.     Rae's statements, Harrell's, Horn's and Rae's early June, 2011 on-site, oral authorizations to DT, made through Shelton, to continue the relocations and the drilling of the geothermal well field, as well as Horn's on-site approval of a flat three-hour charge for each relocation plus Horn's May 17, 2011 email to Harrell (forwarded by email to Shelton on May 26, 2011), transmitted over the interstate wires, were all intentionally false and fraudulent when made.

127.     The statements were intended to fraudulently induce DT to reasonably rely on them so that DT would continue drilling the boreholes necessary for the Project without any delays while Harbour, Rae, the PBC, Harrell, and Horn all knew that PBC and Harbour had no intention of ever paying DT for its extra work and resulting costs.

128.     Despite Rae's repeated statements to Shelton and DT, both orally and in writing through emails, that DT would be paid for its drill rig relocation extra costs, but that Harbour first had to "package" DT's requests for those payments with other subcontractors' requests for payments, Rae, on behalf of Harbour, and Harrell, on behalf of the PBC, had already made a secret agreement when DT encountered the first of the undisclosed, underground obstructions that the PBC and Harbour would deliberately withhold all payments for DT's drill rig relocations until DT had completed all of its work on the geothermal portion of the Project,

30

including digging horizontal trenches for the lines connecting the boreholes to the vaults in the hope that no payment would be necessary because of a credit owed to the PBC by Optimal (although not by DT).

129.    Prior to DT's bidding the project, Optimal had partially redesigned the geothermal portion of the Project by reducing the number of pressurized vaults to just three which reduced the overall cost of the geothermal portion of the Project.

130.    Harbour and the PBC hoped that Optimal's credit owed to the PBC would fully offset the amount owed to DT for the drill rig relocations so that the PBC would not have to pay DT anything for its drill rig relocations despite the fact that the credit was owed to the PBC by Optimal, not DT, which in the end would never be paid at all for its excess costs on the Project due to the undisclosed, underground obstructions.

131.    Unaware of both the PBC's and Harbour's hope to eliminate DT's payments altogether because of the Optimal-owed credit and the PBC's and Harbour's resulting agreement to delay all of DT's payments for the extra costs of the undisclosed underground obstructions, DT continued timely submitting its written invoices for that extra work to Optimal as Rae had directed DT to do, ostensibly to allow the requests to pass through Optimal as a minority-owned contractor so that Optimal could apply its markup to the invoices and satisfy the minority- and women-owned business requirements of the PBC/Harbour general contract.

132.     In reality, Rae and Harbour directed DT to submit its invoices to Optimal for transmission to Harbour simply to ensure that payments for DT's drill rig relocation costs *had* to pass through Optimal so that those payments could be offset by Optimal's credit owed to the PBC.

133.     Meanwhile, Harbour continued stalling off DT in its repeated requests for payment of its drill rig relocation costs in order to protect Harbour's agreement with the PBC, Harbour's RICO principal and co-conspirator, to delay, and ultimately eliminate DT's drill rig relocation payments by using Optimal's credit as an offset.

134.     As late as late-August or early September, 2011, Mark Karaskiewicz ("Karaskiewicz"), another of Harbour's Project executives, was still claiming to DT that Harbour had not, and could not submit the DT/Optimal change orders to the PBC in isolation; rather Karaskiewicz told DT, DT's requests for payment had to be "packaged" with those of other subcontractors and submitted to the PBC as a single request for payment.

135.     Rae echoed Karaskiewicz's fraudulent statements in a September 14, 2011 email to Shelton at DT's principal place of business in Michigan, as well as to Optimal, stating, *inter alia*, "Harbour was waiting for the necessary backup and documentation for each change order.... It is Harbour's opinion that the additional work was preformed, that the PBC was aware that the work was taking place."

136. Rae's and Karaskiewicz's fraudulent statements were made both to conceal Harbour's and the PBC's fraudulent scheme, and their fraud committed to date, as well as to fraudulently induce DT to continue working on the Project.

137. Unfortunately for the PBC and Harbour, DT also encountered vertical, undisclosed underground obstructions, *i.e.*, additional foundation footings, when it began digging the trenches for the lines to connect the boreholes to the vaults.

138. These undisclosed, vertical underground obstructions increased DT's costs even more, including the need for hauling away and disposing of excess soil because the vertical obstructions caused DT to have to excavate wider trenches than originally specified both in the PBC's and Harbour's bid documents, and in DT's and Optimal's contracts for the Project.

139. Rae directed DT to continue its trenching activities, and as with DT's invoices for the vertical undisclosed underground obstructions, Rae also directed DT to send its invoices to Optimal for submission to Harbour and the PBC for payment, but DT's total additional costs for the vertical and horizontal, undisclosed underground obstructions quickly exceeded the amount of any credit that Optimal owed to the PBC.

140. That defeated the object of the PBC's and Harbour's secret agreement to withhold payment from DT for the undisclosed underground obstructions in the hopes that those payments would be offset by Optimal's credit.

141. Consequently, beginning in or around late September, 2011 Karaskiewicz, on behalf of Harbour, began engaging in a game of "good cop/bad

33

cop," submitting the DT/Optimal change orders to Harrison Staley ("Staley"),
Harrell's replacement PBC supervisor, so that Staley could reject them, with a
"wink and a nod" as "insufficient" without bothering to send them to the PBC's
headquarters for authorization for payment.

142.    On September 21, 2011, just before Harrell was replaced by Staley,
during a meeting in Harbour's headquarters with Karaskiewicz and Rae from
Harbour, Shelton for DT and two principals of Optimal, Ray expressly stated that
the change orders had been "approved" by Harrell and were being sent downtown to
the PBC for "final approval" and payment.

143.    That statement was intentionally false and fraudulent, intended to
further defraud DT into continuing its work on the Project while also concealing
these three defendants' fraud from DT because Karaskiewicz had already begun, or
was about to begin the "good cop/bad cop" game with Staley.

144.    Consistent with Harbour's course of conduct, although Patrick S.
Harbour ("Harbour, Jr."), a principal of defendant Harbour, admitted under oath in
his March 21, 2014 deposition in *DT Boring, Inc.* v. *Travelers Casualty And Surety
Co. of America*, 12 L 12781, that it is defendant Harbour's position that DT should
be paid for its extra work resulting from the vertical and horizontal, undisclosed,
underground obstructions, Harbour has never paid DT anything for these additional
costs for the Project.

145.    Instead, Harbour is now trying to recover the money for itself in
*Harbour Contractors, Inc.* v. *Public Building Commission of Chicago*, 14 CH 16728

34

where Harbour is seeking, *inter alia*, compensation for its huge, cost overruns and delays in completion of the Project for which the PBC first terminated Harbour, then suspended the termination, before terminating Harbour once again.

### The Asbestos-Related Downtime

146.    Harbour was already behind schedule when, on or around August 19, 2011, while working on the trenches for the geothermal vaults, Shelton encountered what appeared to be a large furnace pipe with some type of wrapping around it located inside a concrete culvert or tunnel.

147.    Shelton removed the pipe, and placed it near the PBC's trailer where Harrell and Horn had their project offices.

148.    Several days later, Rae told Shelton to move the pipe farther from the trailer.

149.    A few days after that, in the morning of August 31, 2011, Optimal's Piazza, examined the pipe and concluded that the wrapping might be asbestos.

150.    Piazza immediately notified Horn who telephoned defendant EDI, and asked them to have someone come to the Project site to examine the piping insulation.

151.    Horn also emailed Tomas-Foster at or about 11:58 AM on August 31, 2011, informing her of the location of possible asbestos in "some piping insulation."

152.    Tomas-Foster emailed Horn in response at 2:51 PM on August 31, 2011 stating, *inter alia*, "I would not have the contractor pull out anything else from those tunnels until they are tested for asbestos."

35

153. Shelton had never told anyone that the furnace pipe had been found in a "tunnel."

154. Tomas-Foster's statement establishes both her knowledge, as well as the PBC's, of the undisclosed, fraudulently concealed asbestos on the Project site to which DT's employees, as well as other workmen on the Project, and the teachers, staff and students of the public school located across the street, were all exposed.

155. EDI allegedly concluded, even before its inspector arrived on site, that the asbestos was non-friable, meaning that it could not be crushed easily into dust by hand pressure, and therefore, that it was not dangerous because it could not move through the air where it could be inhaled, damaging the lungs, and possibly causing asbestosis and/or cancer.

156. EDI's inspector took samples of the suspected asbestos, and again concluded that the material was non-friable, before sending the samples to a lab for testing.

157. Meanwhile, the area where the pipe had been located was cordoned off, and DT was ordered to resume work in a different area, although because of the restrictions on where DT could work, only Shelton resumed working on the trenches with a Bobcat front loader while the rest of DT's crew had to stand idle.

158. The following day, September 1, 2011, Optimal's Piazza closely examined, for the first time, one of the trenches in which DT's employees, including Shelton and two of his sons, had been working for several weeks with the dry dust

36

from the trench blowing over them in the hot, August wind, as well as blowing across the street to where a public school is located.

159.     There was a discolored vein of material all along the trench wall that Piazza believed was also asbestos.

160.     Once again, work on the Project stopped, EDI was called, and EDI again took samples, but this time, Optimal issued a formal Notice of Delay, effective as of 2:00 PM, August 31, 2011 because PBC and Harbour had *both* refused to halt work on the Project, expecting DT, nevertheless, to continue working, despite the patently-obvious dangers to DT's workers and, what proved to be a substantial violation of OSHA regulations.

161.     Just as it had on August 31, 2011, EDI appeared again, claiming that the asbestos was non-friable.

162.     EDI took more samples to send to a lab, and it informed Harbour, Optimal and DT that the backfilling of the trenches could resume in the area from where the samples had been taken as long as the workers putting in the stone bed, and covering it with soil, *i.e.*, those backfilling the trenches, did not disturb the area, and worked "downwind" of the trenches being backfilled, meaning that any friable asbestos being picked up as dust, and carried by the wind, would be inhaled by DT's employees and subcontractors who were working in the Project's trenches.

163.     In a September 2, 2011 email sent to Shelton at DT's principal place of business in Michigan, as well as to Horn, Karaskiewicz and Piazza of Optimal,

Harbour's Rae issued a formal back to work order, reaffirming that backfilling the trenches should proceed "downwind."

164.    Not wanting to endanger his sons, Shelton took over the backfilling personally, preferring to put himself in danger, rather than his sons.

165.    Meanwhile, because of his licensing – Shelton is a mandated OSHA reporter –he reported the asbestos findings to OSHA which did a site visit on or about September 9, 2011, and determined that friable asbestos was present in significant quantities, and subsequently issued citations both to Harbour and to DT, because Shelton was backfilling the trenches at the time of the OSHA site visit pursuant to EDI's direction and Harbour's order to return to work.

166.    Shelton also notified the Illinois EPA, which began its own investigation, but on information and belief, based on subsequent statements made by the EPA investigator, Tomas-Foster personally derailed the IEPA investigation by fraudulently misrepresenting to the IEPA that the Project site had previously been designated a waste dump, when, as was actually the truth, the Project site had actually been designated a "demolition site."

167.    As a result of Tomas-Foster's false and fraudulent statements to the IEPA investigator, again, on information and belief, based on statements by the IEPA investigator assigned to the Project, the IEPA determined that it had no jurisdiction over the Project's asbestos remediation.

168.    Instead, relying on Tomas-Foster's false and fraudulent statements, the IEPA decided that jurisdiction belonged, instead, to a federal agency that would

38

pay the remediation costs for the Project site, thereby saving the PBC and/or the City of Chicago the cost of the remediation.

169.     Also on September 9, 2011, the date of the OSHA inspection, Optimal received test results from samples that it had hired its own lab to take and test.

170.     Because those test results, like OSHA's, also showed friable asbestos – directly contrary to EDI's assessment when DT had been ordered back to work in the asbestos-contaminated soil eight days earlier – Optimal issued a stop work order at 11:48 PM, September 9, 2011 with a direction for DT to vacate the Project site.

171.     Shelton, on behalf of DT, also wanted his own independent confirmation of the site conditions, so he hired his own environmental testing company which conducted a walk-through inspection of the Project site on September 15, 2011, and issued its report on September 19, 2011 finding that at least four samples that it had taken contained friable asbestos.

172.     Faced with the multiple test results showing friable asbestos, as well as the OSHA investigation, Harbour finally agreed that the stop work order could remain in effect until both abatement measures had been taken to remove the asbestos-contaminated soil, and Harbour had hired an industrial hygienist to confirm that the Project site was again safe to work on, all as required by applicable OSHA regulations.

173.     PBC subsequently arranged for the abatement of the contaminated soil, but that took place in the middle of the night so that no one could see what was

being done, or how the abatement was performed.

174.     On Thursday, October 20, 2011 Karaskiewicz sent an email to Shelton at DT's principal place of business in Michigan, as well as to Sanjiv Pillai, Gary Birman and Piazza of Optimal, and to, *inter alia*, Harbour's Rae, Lisa Fricker and Harbour, Jr. outlining a proposed Asbestos Hazard Control Plan.

175.     As part of that plan, on or about Saturday, October 29, 2011, following a heavy rainfall over Friday night into Saturday morning that turned the soil on the Project site to mud, and which would have prevented any asbestos particles from becoming airborne, Harbour's industrial hygienist, defendant Dimos, conducted a test for airborne asbestos particles.

176.     DT's employees and subcontractors wore hazardous material clothing including respirators, and they worked throughout the day with backpacks that supposedly were intended to sample the air continuously and to collect any airborne asbestos around the individual workers.

177.     Naturally, given the soggy site conditions, the test results from analyzing the workers' backpacks came back as negative for any airborne asbestos and Dimos's report cleared the area for DT and its employees to return although, Dimos's November 1, 2011 report also states that, "if conditions change, then [these] conclusions would change."

178.     That simply meant that when the ground dried up in two or three days, it was entirely likely that the friable, on-site asbestos would become airborne again and be inhalable by the workers.

40

179.     Apparently taking no chances, Dimos either used nonfunctioning backpacks or he phonied up the test results because, unknown to DT until much later, at least one of DT's subcontractors had removed some of the asbestos from the original samples taken back in September that were stored in a sealed plastic bag in Shelton's truck, and throughout the day of the test, the subcontractor periodically fed a small bit of asbestos into the intake for his backpack.

180.     That means that the test results from at least the subcontractor's backpack should have come back as highly positive, but all of the backpacks were deemed to be "negative" for asbestos by Dimos so, according to his November 1, 2011 report, DT could safely return to work.

181.     Harbour, aided by Dimos was deliberately trying to fraudulently induce DT to return to work despite the clearly hazardous site conditions.

182.     Those hazardous conditions are further shown by the fact that, during the course of DTs work on October 29, 2011, an additional vein of suspected asbestos was discovered in the trench in which DT was working, and the sample was sent out for testing.

183.     Consistent with the defendants' overall, fraudulent course of conduct, it was not until reviewing the April, 2015 depositions of Horn, Staley, and Ray Giderof, the PBC's Director of Construction ("Giderof") taken in the case of *Harbour Contractors, Inc.* v. *Optimal Energy, LLC*, 13 L 2975 that DT learned that EDI's testing had revealed that the sample taken in DT's October 29, 2011 work area *also* contained asbestos, and that much of the stockpiled soil from DT's pre-September

41

2011 work also contained asbestos and should have been removed immediately by the PBC before allowing DT and its employees to work around the geothermal well field, but Harbour and the PBC wanted nothing to delay DT's work on the Project, so the PBC, EDI and Harbour concealed that information from DT.

184.     Meanwhile, following Optimal's September 9, 2011 stop work order, Shelton repeatedly told Harbour – and specifically Karaskiewicz – that, because DT had not been released from the Project, DT had to continue paying its employees even while they were unable to work because of the hazardous site conditions, and that its equipment was sitting idle instead of being used on other projects, thereby costing DT even more money and Karaskiewicz acknowledged Shelton's statements.

185.     At the September 21, 2011 meeting at Harbour's Plainfield, Illinois headquarters, Karaskiewicz asked Shelton to give Harbour DT's *per diem* cost resulting from Harbour's decision not to release DT from the Project to do other work until the Project site had been remediated.

186.     DT immediately informed Karaskiewicz that the cost was approximately $4200 per day including payroll and losses for idle equipment, as well as for the cost of maintaining security for the equipment, for all of which DT expected to be paid.

187.     DT also informed Harbour that DT was having to turn down other work because it had not been released from the Project even though its employees were forced to sit idle from September through November 18, 2011 because of the stop work order.

188.     Over the next two months, DT repeatedly and directly reminded Harbour (and again, specifically Karaskiewicz) that Harbour was costing DT $4200 per day (plus lost business revenue from other projects) by not releasing DT from the Project and DT repeatedly invoiced Harbour and demanded payment for its asbestos-related downtime at $4200 per day plus lost profits from other projects that DT had to decline because Harbour would not release it from the Project.

189.     Optimal has stated that it was excluded from the negotiations for, and played no role in DT's agreement with Harbour for payment for DT's asbestos-related downtime which was reached directly between DT and Harbour.

190.     Finally, on November 1, 2011 while DT was waiting for instructions on which material to use to complete the backfilling of the trenches, Rae ordered DT off the Project, basically firing DT, and DT began to demobilize from the Project.

191.     Harbour, Jr. immediately telephoned Shelton, asking for a meeting, and that same afternoon, they met in a coffee shop near the Project with Harbour, Jr. telling Shelton that Rae had not really meant that DT should leave the Project and he asked Shelton to remain.

192.     As with the undisclosed, underground obstructions, Harbour Jr. testified in his March 21, 2014 deposition in *DT Boring, Inc.* v. *Travelers Casualty And Surety Co. of America*, 12 L 12781, that, to induce DT to return to the Project, Harbour, Jr. told Shelton that defendant Harbour would resolve all of the outstanding issues on the monies owed to DT so that DT would be paid.

193.     Harbour, Jr. further testified that it is defendant Harbour's position

that DT should be paid for its asbestos-related downtime.

194.     Nevertheless, Harbour has never paid DT anything for these additional costs for the Project which Harbour itself is seeking to recover in its current lawsuit against the PBC – on information and belief – to unjustly enriched itself to make up at least a portion of its cost overruns due to its mismanagement of the Project, and not to pay over those funds to DT.

195.     Unaware that Harbour, Jr.'s statements were just another fraudulent inducement for DT to return to the Project, as a show of good faith, Shelton agreed with Harbour, Jr. to delay DT's demobilization.

196.     As a further show of good faith, on November 11, 2011, DT responded to Rae's email request of that date to winterize the geothermal field by cordoning off the field with tape, blowing out water that had already accumulated in the upper portions of the geothermal loops, and installing loop locks₍sm₎ to seal off the loops so that water from rain and snow could not enter and fill the loops during the winter; a condition that is difficult and time-consuming to correct in the spring when work resumes again.

197.     Nevertheless, one week later on November 18, 2011 Rae ordered DT, and Shelton in particular, never to return to the Project site again because Shelton allegedly had spoken in a "threatening" manner to the PBC's Staley, and had been interviewed on Fox News about the asbestos on site.

198.     As result, Optimal, issued a formal termination notice to DT citing among other bases, DT's repeated, direct communications with Harbour from which

Optimal been excluded despite the fact that it was Optimal that had the direct, written subcontractor agreement with Harbour.

199.    As set forth above, in conformance with their fraudulent scheme to bring the Project in below budget by depriving their subcontractors of their profits and/or their payments for their contract work, and/or for their extra work, despite Harbour, Jr.'s fraudulent November 1, 2011 contrary statements, the PBC and Harbour never intended to pay DT the extra costs that DT incurred because of the undisclosed underground obstructions

200.    Rather, the PBC and Harbour told DT that it would be paid those extra costs to fraudulently induce DT to continue its work on the geothermal well field.

201.    Harbour also never intended to pay DT for its September through November 18, 2011 downtime, telling DT that it would be paid just to fraudulently induce DT to remain on the Project while Harbour tried to figure out how most cheaply to deal with multiple environmental and work related violations that the PBC had fraudulently concealed from DT while DT was bidding on the Project.

202.    In fact, the PBC's and Harbour's joint fraudulent conduct toward DT continued even after November 18, 2011, extending at least to the January 26, 2012 meeting in Harbour's on-site trailer with, *inter alia*, Harbour Jr., Karaskiewicz, Piazza, Shelton and the PBC's Giderof.

203.    According to Harbour, the purpose of the meeting, was to resolve all of the payment and performance issues existing among the parties.

204.     During the meeting, Giderof told Shelton that "we" – meaning Harbour and the PBC – "owe you money" and that "we need to get you paid" but, as set forth above, DT has never been paid the funds owed by the PBC and Harbour for either the vertical and horizontal, undisclosed, underground obstructions, or for DT's asbestos-related downtime.

205.     Giderof's statements were made to lull Shelton and DT into believing that DT would be paid soon and to delay DT from pursuing any of its remedies.

206.     On information and belief based on the circumstances set forth above, Harbour's and PBC's refusal to process and pay DT's invoices was also done partially in retaliation for DT's having complied with the applicable state and federal laws by "blowing the whistle" on PBC's and Harbour's multiple, asbestos-related, environmental and workplace violations on the Project by notifying and causing investigations of the Project by OSHA and the IEPA.

207.     Harbour's and the PBC's deliberate and fraudulent refusal to pay DT's invoices ate up virtually all of DT's working capital and put it out of business.

208.     Without any working capital, DT could no longer even bid on projects because DT could not afford liability insurance, or the upfront costs associated with a project such as payroll, union dues and benefit fund payments, as well as the costs of fuel and supplies, all of which DT would have to cover during the typical four-to six-week delay between beginning a project and receiving its first payment for the project.

209.     Harbour's and PBC's deliberate and fraudulent refusal to pay DT's

46

invoices also subjected DT to multiple lawsuits, claims and administrative proceedings, thereby causing it additional losses in attorneys' fees to defend itself.

210.    Harbour's and PBC's actions were willful and wanton.

211.    Harbour even continued its fraudulent conduct after DT filed two lawsuits attempting to recover the money owed to it.

212.    DT filed *DT Boring, Inc.* v. *Travelers Casualty and Surety Co. of America*, 12 L12781 in the Circuit Court of Cook County seeking to recover under the performance and payment bond that Travelers Casualty and Surety Co. of America ("Travelers") issued for PBC's benefit, and on which Harbour was the principal.

213.    DT's complaint in the state court case expressly included DT's claims for its extra costs due to the vertical and horizontal, undisclosed, underground obstructions and DT's asbestos-related downtime.

214.    DT also filed a prior version of this *Complaint* in the United States District Court for the Northern District of Illinois captioned as *DT Boring, Inc.* v. *The Chicago Public Building Commission, et al.*, 13-C-0450 setting forth claims for, *inter alia*, fraud and conspiracy under the federal RICO statute, 18 U.S.C. §§1961-1968, and alleging as part of DT's damages its extra costs due to the vertical and horizontal, undisclosed, underground obstructions and DT's asbestos-related downtime.

215.    As frequently occurs with payment and performance bonds, Travelers tendered its defense in DT's state court proceedings to its bond principal, Harbour.

47

216.     Harbour, in turn, retained the law firm of Duane Morris, LLP ("Duane Morris") both to represent Travelers in DT's state court case, and to represent Harbour itself in DT's federal case.

217.     In the federal case, Duane Morris attorneys John T. Shriver ("Shriver") and Adam Gill ("Gill"), acting on behalf of Harbour, successfully persuaded Judge Gettleman of this Court to dismiss DT's federal complaint on the basis that DT's RICO claims were premature until DT had completed its state case.

218.     Gill and Shriver successfully argued to Judge Gettleman that DT's RICO claims were not ripe until DT had exhausted its remedies in state court under the performance bond which would render DT's damages "clear and definite" because, according to Gill and Shriver, in theory, DT could make a full recovery of its damages through the performance and payment bond.

219.     Gill, Shriver and Harbour succeeded in Harbour's motion to dismiss DT's first federal case on this basis despite the fact that DT explained to Judge Gettleman that DT's damages included consequential-and other damages not covered by the bond.

220.     Meanwhile, Duane Morris's Gill and Charles Lewis ("Lewis"), representing Travelers, answered DT's state court Complaint by claiming that Travelers lacked the requisite knowledge to respond to virtually all of the Complaint's allegations.

221.     Through Gill and Lewis, Travelers similarly answered DT's written discovery by stating that Travelers knew of virtually no responsive facts relating to

the state court case, and that Travelers had no responsive documents in its possession *or control* despite the fact that, as Harbour's surety defending against DT's claims on the same factual and legal bases as Harbour would (including raising Harbour's affirmative defense of "offset" by claiming that Harbour incurred additional costs to complete the geothermal portion of the Project after DT's departure), Travelers both required for its defense, *and* had access through Duane Morris, their joint counsel, to all of Harbour's knowledge, witnesses and documents. While that knowledge, and those witnesses and documents may not have been in Travelers's *possession*, they were surely in its "control" as demonstrated by subsequent events, but none of that was produced.

222.    When DT shortly thereafter issued document subpoenas to the PBC and to Harbour seeking all of their documents relating to the geothermal portion of the Project, and issued oral deposition subpoenas to among others, Rae, Karaskiewicz, Horn, Tomas-Foster, and Giderof, as well as to the PBC and to Harbour themselves under Illinois Supreme Court Rule 206(a), Travelers, represented by Duane Morris's Gill and Lewis joined the PBC in a motion to quash *all* of DT's subpoenas claiming that *none* of the PBC's and Harbour's documents, had any relevance to DT's state court case, and that none of the PBC's and Harbour's witnesses had *any* knowledge that was relevant to DT's state court case.

223.    During the hearing on the motions to quash, Gill admitted on the record that although he did not "know" any of the facts relevant to the state court

49

case when he was representing Travelers, he actually did know the facts when representing Harbour.

224.     Now confronted by Travelers's refusal through Duane Morris to identify any facts, witnesses or documents supporting its defense in DT's state court case, and with Travelers's affirmative statements through Gill and Lewis that none of the documents in Harbour's possession (including those already known to DT), and that none of Harbour's employees, (even those with whom Shelton had dealt directly during the Project), as well as Harbour itself, had any knowledge with any relevance to the state court case – especially when those statements by Duane Morris were made against the backdrop of, what DT had to assume had been a good faith representation by Duane Morris to Judge Gettleman on behalf of Harbour that DT could reap a full recovery in its state court case – DT was left with no clue as to any of Travelers's legal or factual theories for its defense, and therefore nowhere to start with oral discovery.

225.     Consequently, at DT's request, the state court entered and continued the PBC's and Travelers's motions to quash while DT moved for summary judgment to force Travelers to reveal the legal and factual bases on which it was defending against DT's claims.

226.     It was only during summary judgment motion practice in early 2014 that Travelers, through Duane Morris, first argued to the state court that, based on the language on the face of the bond, the bond did not cover DT's asbestos-related downtime.

50

227.     Travelers, through Duane Morris, contended on that the bond applied to subcontractors who performed labor and/or supplied materials, but not to subcontractors like DT which remained on the Project at the general contractor's request, but without supplying labor and materials.

228.     Because this argument was based on the language on the face of the bond itself, it was clearly known to both Harbour and to Travelers – and certainly known to their joint counsel, Duane Morris – from the inception of both DT's state court and federal cases.

229.     Nevertheless, Travelers and Duane Morris's Gill and Lewis delayed raising this defense to the single, largest line item of DT's damages until months after Harbour, and Duane Morris's Gill and Shriver had successfully persuaded Judge Gettleman to dismiss DT's federal case by arguing that DT could recover all of its damages in the state court bond case against Travelers.

230.     Based on those facts, on information and belief, Harbour and its attorneys conspired together to have DT's federal case dismissed by arguing to Judge Gettleman that DT could have a full recovery in its state court case while already knowing that Harbour's argument was false based on the language of the bond, itself.

231.     Harbour's attorneys, while representing Travelers, deliberately delayed raising the argument that the bond did not cover DT's asbestos-related downtime until more than 30 days after Judge Gettleman had dismissed DT's federal case because raising the defense any earlier would have meant that

51

Harbour, their other client, would have lost its motion to dismiss before Judge Gettleman.

232.     This conclusion is supported by subsequent events.

233.     During the nearly two years that DT was litigating its federal and state court cases, as stated above, Harbour (and occasionally Travelers) was sued by at least eight other subcontractors on the Project because they, like DT had not been paid.

234.     Harbour itself sued Optimal, for allegedly breaching it subcontract with Harbour by not completing the geothermal portion of the Project.

235.     In all those cases, Harbour and Travelers were represented by Duane Morris, and specifically by Gill, so that Gill and Duane Morris had ample opportunity to become fully acquainted with the facts, the documents and the witnesses involved in the numerous disputes over subcontractors' payments for the Project.

236.     Nevertheless, Gill and Lewis – now joined by Duane Morris attorney Benjamin Johnston ("Johnston"), and Duane Morris itself waited until approximately one week before the late-November, 2014 close of discovery in DT's state court case (when trial had long been scheduled to begin on January 9, 2015) to disclose hundreds of new Harbour documents, and to identify, among Travelers's other trial witnesses, Rae, Karaskiewicz, Staley, Harrell, Horn and Griderof after having contended until just a few months earlier that none of the documents or those trial witnesses had any relevance whatsoever to DT's state court case.

52

237. Travelers's/Duane Morris's explanation for this last-minute disclosure was that Harbour had only provided the documents to Travelers's counsel a short time before Travelers's counsel had produced them as trial exhibits, and that Gill, Lewis and Travelers had first learned of the existence of Rae, Karaskiewicz, Staley, Harrell, Horn and Griderof and their knowledge of the case from DT's written discovery answers.

238. Transliterated, the first part of Duane Morris's explanation means that Gill, Lewis and Duane Morris wearing their "Harbour hat", deliberately waited at least 18 to 24 months *to give to themselves* (while wearing their "Travelers hat") Harbour's *own* documents.

239. These documents included summary exhibits of underlying documents that clearly were prepared for, and at the direction of the Duane Morris attorneys while wearing their "Harbour hat" solely for use in the Travelers's case.

240. The Duane Morris attorneys delayed "giving themselves" the Harbour documents for nearly two years even though Harbour, its personnel, as well as its counsel, long-knew that Travelers needed the documents to defend itself in DT's state court case because they were all well familiar with all of the facts, documents, witnesses and other evidence on a real-time basis from having been present for the events and through the multiple cases spawned by the PBC's and Harbour's fraud.,

241. Harbour's/Travelers's joint counsel, Duane Morris delayed producing the documents even though the documents were always well within Travelers's control through those joint counsel, and through Travelers's surety/principal

relationship with Harbour which allowed, if not required Travelers to present Harbour's defenses to DT's claims under the bond.

242.     The second part of Duane Morris's explanation, *i.e.*, that it first learned of the existence of most of its trial witnesses from DT's written discovery responses, if taken literally, means that Duane Morris and Travelers conducted absolutely no investigation of the facts and evidence during the first five months of DT's state court case, despite having both answered DT's state court Complaint, and promulgated Travelers's written discovery, as well as having answered DT's written discovery, but this statement is false on its face.

243.      Travelers's Answer to DT's Complaint contained both multiple, affirmative factual statements outside the scope of the Complaint's allegations as well as multiple exhibits not yet in DT's possession such as the Harbour/Optimal subcontract and Travelers's payment and performance bond for the Project.

244.     Additionally, if Duane Morris's explanation for its delay in identifying the various trial witnesses were true, which it is not, then Duane Morris, Gill and Lewis admittedly filed and argued Harbour's motion to quash DT's subpoenas to Harbour and to its employees in total bad faith.

245.     The motion to quash was not presented until June 26, 2013 and it contended that neither Harbour nor any of its employees had any knowledge relevant to DT's state court case while DT's answers to Travelers's written discovery identifying all those same witnesses as material to DT's case, *and* explaining the reasons why they were material, had already been served on Duane

54

Morris's Gill on May 2, 2013; nearly 2 months *before* Gill presented and argued Harbour's motion to quash all of the subpoenas issued to its present and former employees, so Harbour and Duane Morris were fully aware of the identities and the materiality of those witnesses nearly two months before arguing to the state court that the witnesses' subpoena should be quashed because they had no knowledge relevant to the case.

246.    Duane Morris's explanation also means that Duane Morris, Gill and Lewis waited more than 18 months *after* learning from DT's own written discovery responses both the identities of Harbour's employees and their roles in the dispute – as though they were not known already from Duane Morris's representation of Harbour – to update Travelers's interrogatory responses which had stated since April, 2013 that Travelers knew of no one with any knowledge of the facts of the dispute except for Harbour, Jr., despite Travelers's continuing duty to update its discovery responses as new information was acquired.

247.    Lastly, Duane Morris, Gill and Lewis waited until filing Travelers's trial brief in mid-December, 2014, just a few weeks before trial had long been scheduled to begin, to raise multiple defenses, all based on the various contract documents that Duane Morris, Gill and Lewis had attached as exhibits to Travelers's Answer, nearly two years earlier.

248.    Despite being fully aware of these possible contract defenses from the inception of the parties' litigation, not only were they not included as affirmative

defenses in Travelers's original Answer, but Duane Morris, Gill and Lewis never sought leave to file an amended answer to add those defenses.

249.     Among those contract defenses was a "pay if paid" provision that did not require Harbour to pay any of its subcontractors pursuant to their various subcontracts until Harbour had first been paid by the PBC.

250.     If successful, then that defense would have precluded any recovery by DT in its state court contract/bond case case which, upon information and belief, is precisely why Duane Morris, Gill and Lewis delayed raising the defense: the delay enabled Duane Morris, Gill and Shriver to argue successfully and fraudulently to Judge Gettleman that DT's federal case should be dismissed because DT could substantially, or entirely recover its damages in its state court case even though they knew at the time that statement was false because of the "pay if paid" provision.

251.     Besides never presenting the contract defenses, including the contractual "pay if paid" defense, in Travelers's Answer as affirmative defenses, Duane Morris, Gill and Lewis, fraudulently concealed and failed to disclose those contractual defenses that they later raised in Travelers's trial brief by failing to provide them either in Travelers's original response to DT's Interrogatory No. 9, or in any amended response even though that interrogatory specifically requested that Travelers identify all of the reasons that Harbour had failed to pay DT both for its time and expenses in relocating its drill rigs due to the undisclosed, underground obstructions and for DT's asbestos-related downtime.

56

252.     Again, a timely disclosure of those defenses in Travelers's April, 2013 responses to DT's Interrogatories would have been used by DT in its response to Harbour's motion to dismiss DT's federal case, so those defenses were not raised until just before trial so that: i) Harbour, Duane Morris, Gill and Shriver could successfully and deceptively argue that Judge Gettleman should dismiss DT's federal claims in favor of DT's exhausting its remedies in the state court case where according to Harbour, Duane Morris, Gill and Shriver, DT could recover most or all of its damages; and ii) Duane Morris, Gill and Lewis, purportedly on behalf of Travelers – but actually on behalf of Harbour which has to indemnify Travelers for any payout under the bond – could ambush DT with entirely new legal and factual theories on the eve of trial.

253.     The upshot of all of these deceptive actions is that DT settled its state court case against Travelers for only part of its damages, while reserving its claims and damages asserted here in both the parties' settlement agreement, and by court order.

254.     On information and belief based on the foregoing facts, the deceptive actions of Duane Morris, Gill, Lewis and Shriver in DT's state and federal cases were committed on behalf of Harbour as a continuation up to almost the date of filing of this Complaint of Harbour's RICO and other tortious activities.

255.     The actions were committed on behalf of Harbour and were intended at least to delay, if not to prevent altogether DT from collecting all of its damages by simultaneously pursuing its federal claims directly against Harbour, and DT's state

claims against Travelers because Travelers is entitled to indemnification by Harbour for any damages that Travelers pays out under the bond.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against defendant Harbour and an award of treble damages calculated on a base amount of at least $400,000, plus punitive damages of $2 million, DT's attorney's fees, and DT's costs.

## COUNT II – RICO CLAIM (18 U.S.C. §1962(c)) –HARBOUR

256.    Plaintiff DT repeats and realleges ¶¶ 1-255 as though the same were fully set forth herein as ¶256 of Count II.

257.    As set forth above, Harbour conducted and/or participated directly and/or indirectly in the conducting of the RICO enterprise's affairs through a pattern of racketeering activity in violation of, at least, 18 U.S.C.A. §§ 1341, 1343, and 1951.

258.    As a result, Harbour has violated and continues to violate 18 U.S.C. §1962(c) as a direct and proximate result of which, DT has suffered substantial damages as also set forth above.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against Harbour, and an award of treble damages calculated on a base amount of at least $400,000, plus punitive damages of $2 million, DT's attorney's fees, and DT's costs.

## COUNT III
## RICO CLAIM (18 U.S.C. §1962(d)) –HARBOUR, EDI and DIMOS

58

259.     Plaintiff DT repeats and realleges ¶¶ 1 255 as though the same were fully set forth herein as ¶ 259 of Count III.

260.     As set forth above, the PBC, Harbour, Dimos and EDI have conspired together to violate U.S.C. §§1962(b) and (c).

261.     Harbour's, Dimos's and EDI's conduct has violated and continues to violate 18 U.S.C. §1962(d) as a direct and proximate result of which, DT has suffered substantial damages as also set forth above.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against Harbour, Dimos and EDI, and an award of treble damages calculated on a base amount of at least $400,000, plus punitive damages of $2 million, DT's attorney's fees, and DT's costs.

## COUNT IV – COMMON LAW FRAUD – PBC and HARBOUR (Undisclosed Underground Obstructions

262.     Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-145, 190-192, 194-200, 202-255 as though the same were fully set forth herein as ¶ 262 of Count IV.

263.     As set forth above, unlike the PBC's usual conduct in its RICO activities in which it relies on its general contractors to defraud its project subcontractors with fraudulent misrepresentations and omissions, here the PBC actually made fraudulent misrepresentations and omissions of its own.

264.     As also more fully set forth above, it appears from Harbour's April, 2015 *Harbour* v. *PBC* depositions of the PBC's present and former employees

involved in the Project that the PBC knew before the Project bid documents were issued that the asbestos-wrapped steam lines as well as the undisclosed, underground vertical and horizontal obstructions remained on site, concealed by several feet of soil.

265.     Consequently, on information and belief, the PBC knew at the time that it issued the Project bid documents that its statement in ¶ A of Part 1.6 of "Book 3A, Technical Specification, SECTION 00201, Part 1-General" of the PBC's Project construction plans and specifications that the remaining, subsurface structures on the Project site had been removed in April 2010 as part of the site preparation was false.

266.     On information and belief, the PBC intentionally made those false statements because it recognized before its bid documents were issued to potential bidders both that the cost of the necessary remediation of the Project site's asbestos contamination would be steep, and that the increased construction cost of the Project's geothermal well field due to the remaining, undisclosed, underground vertical and horizontal obstructions also would be substantial.

267.     Consequently, the PBC made its false statement in ¶ A of Part 1.6 of Book 3A to shift some or all of those costs for the underground obstructions to the geothermal subcontractor(s) and to minimize its asbestos remediation costs by having the geothermal subcontractors continue working despite the presence of asbestos by conducting itself as though there were no asbestos on site, hoping that little if any asbestos would be recognized as such, and denying that any discovered

asbestos prevented work from continuing despite OSHA regulations prescribing any work prior to remediation, and. federal and state laws requiring that remediation

268. Therefore, the PBC deliberately, intentionally and fraudulently represented in ¶ A of Part 1.6 of Book 3A that *all* "remaining subsurface structures" on the Project site had been removed in April 2010 as part of the site preparation" to fraudulently induce geothermal subcontractor bidders to underbid the Project.

269. The PBC's intended result was that it and its general contractor– eventually, Harbour –relying on the PBC's primary general contractor's contract's "pay-if-paid" provision (incorporated by reference into the subcontractors' subcontracts) could avoid paying those extra costs by ordering the geothermal contractor and/or subcontractors to complete the geothermal well system pursuant to their respective, fraudulently-induced, underbid contracts followed by the PBC's deliberately disregarding its own change order procedures as stated in its own bid and contract documents.

270. Those procedures require immediate resolution of all change order requests, but the PBC has deliberately left open and unresolved all of DT's change orders for its asbestos-related downtime and for the costs of the undisclosed, underground vertical and horizontal obstructions.

271. Harbour joined with the PBC in its fraudulent scheme to defraud DT of its additional cost for the undisclosed, underground vertical and horizontal obstructions when Harbour's project manager Sam Rae ("Rae") agreed in early May, 2011 with the PBC's project supervisor, James Harrell ("Harrell") that all payments

to DT for its excess costs resulting from undisclosed, underground vertical and horizontal obstructions would be withheld until DT had completed its drilling and trenching activities so that DT's excess costs could be offset against a credit owed by Optimal to the PBC for Optimal's redesign of the geothermal system which resulted in an approximately $15,000 savings on the cost of the geothermal portion of the Project.

272.    Hence, it was always Harbour's and the PBC's intention that DT would never receive any payment of its excess costs due to the undisclosed, underground horizontal and vertical obstructions, even though DT did not owe the redesign credit – Optimal did – and even though DT bid the project *after* Optimal's redesign had been completed, so that DT's bid price already reflected the reduced cost of the overall geothermal aspect of the Project.

273.    Nevertheless, as part of the PBC's and Harbour's scheme to defraud DT, the PBC's Harrell, and Harrell's assistant project supervisor Andy Horn ("Horn"), as well as Harbour's Rae *all* instructed DT to proceed with the drill rig relocations due to the undisclosed, underground vertical obstructions (Horn even specifically asking the cost of the drill rig relocations and approving DT's $1600 per relocation charge).

274.    All three men also directed DT to proceed with the additional trenching, spoilage disposal and increased cost of fill due to the undisclosed, underground horizontal obstructions while already knowing and intending that DT would never receive payment of those extra costs.

62

275.     Harrell, Rae and Horn made these statements as part of the PBC's and Harbour's scheme to defraud DT while already knowing that DT expected to be paid for its extra costs, and knowing and intending that DT would rely on those statements, as well as on the repeated, continuing statements of Rae and eventually Harbour's Karaskiewicz, that DT would, in fact, be paid those extra costs, all in order to fraudulently induce DT to complete the drilling of the geothermal well field which involved approximately 16 drill rig relocations, and to perform the trenching needed to connect the individual geothermal wells to the system's vaults.

276.     DT did in fact rely to its detriment on the PBC's and Harbour's repeated false and fraudulent statements by completing the drilling of the geothermal well field, and by performing the trenching needed to connect the individual geothermal wells to the system's vaults until the Project's shutdown due to DT's discovery of asbestos on the Project site, but DT has never been paid its extra costs for those activities which it performed in reliance on the PBC's and Harbour's false and fraudulent misrepresentations.

277.     As a direct and proximate result of result of DT's reliance on those false and fraudulent misrepresentations, DT has been damaged in the amount of at least $86,204.

278.     The PBC has continued its wrongful conduct by attempting to conceal its fraudulent scheme, Giderof falsely testifying in his April, 2015 deposition on behalf of the PBC that DT was not entitled to be paid for the underground obstructions because, allegedly other drillers on prior projects had not charged for

drill rig relocations and that DT's three hours' time for the drill rig relocations was excessive, even though Harrell and Horn had approved the three-hour charge and had instructed DT to proceed with the drill relocations on that basis.

279.    Giderof falsely maintained in his April, 2015 deposition that *DT* was not entitled to be paid for the underground obstructions as set forth above, even though the PBC and Harbour had agreed between themselves that payment of three hours' time for the drill rig relocations was acceptable and they had used that payment rate to compute monies owed for the drill rig relocations as an offset to the credit owed by Optimal again, in an effort to conceal the parties' fraudulent scheme and to justify the PBC's April, 2015 reaffirmation of its refusal to pay for DTs extra costs resulting from the undisclosed, underground vertical and horizontal obstructions.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against PBC and Harbour and the award of compensatory damages in the amount of at least $86,204 and, plus punitive damages of $2 million, and DT's costs.

## COUNT V – COMMON LAW FRAUD –HARBOUR
### (Asbestos-Related Downtime)

280.    Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-92, 96-97, 102-115, 146-255, as though the same were fully set forth herein as ¶ 280 of Count V.

281.    As set forth above, Harbour was fully aware that a stop work order had been issued on or about September 1, 2011 because of the asbestos that DT

encountered on the Project site which precluded further work.

282.     After the stop work order issued, Harbour refused to release DT from the Project so that DT could perform other work because Harbour and the PBC wanted DT to remain on the Project site to be able to resume work immediately once asbestos-related conditions allowed.

283.     DT repeatedly informed Harbour, specifically Rae and Karaskiewicz, that DT's costs for maintaining its work crew and equipment on-site was $4200 per day which comprised DT's union-mandated pay scale for DT's employees, including the employees' benefit payments made to Local 150 of the International Union of Operating Engineers, plus the rental rate for DT's trucks and other equipment.

284.     Rae and Karaskiewicz on behalf of Harbour told Shelton acting on behalf of DT that Harbour agreed to DT's $4200 per day charge. Rae even worked with Shelton to compile daily rental rates for DT's equipment which were agreeable to Harbour (DT's labor costs already being fixed through its collective bargaining agreement).

285.     Shelton and Karaskiewicz directly negotiated and agreed to that daily amount outside the Optimal contract and without Optimal's involvement.

286.     In fact, it was this this direct agreement between DT and Harbour for DT's asbestos-related downtime that was cited by Optimal as part of the reason that Optimal gave DT a notice of termination from the Project on November 18, 2011, because Optimal it not been included in the negotiations, or the agreement.

287.     Additionally, as stated above, Harbour, Jr. has testified that he told Shelton on November 1, 2011 that Harbour would ensure that DT was paid all monies owing to DT, including the money due because of the undisclosed, underground obstructions, as well as the money due for DT's asbestos-related downtime, if DT returned and remained on the Project site after Rae had ordered DT off the site, thereby reaffirming Harbour's agreement to pay DT for its asbestos-related downtime in return for DT's renewed agreement to remain on the Project site.

288.     Karaskiewicz's, Rae's and Harbour, Jr.'s statements on behalf of Harbour that Harbour agreed to pay DT $4200 per day, however, were knowingly false and fraudulent when made and they were intended to induce DT to remain on, and/or return to the Project site so that DT was always immediately available to begin working again as soon as the asbestos conditions permitted.

289.     As with Harbour's repeated false and fraudulent statements to DT that DT would be paid for its extra work resulting from the undisclosed, underground vertical and horizontal obstructions, Harbour never had any intention of paying DT for its asbestos-related downtime.

290.     Although DT submitted invoices to Harbour for its September and October charges for the downtime, Harbour neither paid the invoices itself, nor even submitted them to the PBC for payment until on or about November 18, 2011 when Rae once again ordered DT off the site, never to return.

291.     With DT's departure from the Project, Harbour was free to further act

66

on its intention to retain for itself whatever monies the PBC paid for DT's asbestos-related downtime; an intention evidenced by the subsequent actions of Harbour and its counsel during the first federal litigation and the Travelers's lawsuit.

292.     In that litigation, Harbour first induced Judge Gettleman to dismiss DT's federal claims based on Harbour's knowingly false argument that DT could recover all of its damages – which expressly included the payments due for DT's asbestos-related downtime – in DT's state court litigation against Travelers, and then Harbour, through Duane Morris, and Gill (Harbour's joint counsel with Travelers) told the state court that Travelers's bond did not cover DT's asbestos-related downtime because Travelers's bond only covers labor supplied, whereas the downtime meant that labor was not supplied.

293.     The upshot was that Harbour delayed DT's recovery of its damages for three years while Harbour actively sought, and continues to seek recovery for itself of the PBC's payment of at least a portion of DT's asbestos-related downtime (as well as other monies owed to DT for the Project).

294.     Additionally, Harbour was also well aware throughout the autumn of 2011 that DT was losing profits on other work because Harbour had not released DT from the Project.

295.     DT repeatedly, expressly informed Harbour of that fact, and Shelton expressly informed Karaskiewicz on or about November 1, 2011 that DT's lost profits to date were $70,000.

296.     Nevertheless, Harbour not only continued to refuse to release DT from

67

the Project from September 1 through November 18, 2011, but Harbour, Jr. has testified that, on November 1, 2011 during a meeting with Shelton to persuade Shelton and DT to return to the Project after Rae had summarily ordered them off t, Harbour, Jr. reaffirmed the obligation to pay DT its charges for the vertical and horizontal obstructions, as well as DT's charges and costs for the asbestos-related downtime by telling Shelton that he, Harbour, Jr, would work out all of the issues delaying DT's payments and would get DT its money.

297.    DT reasonably relied on Harbour's repeated representations beginning in September, 2011 and continuing through November 1, 2011 that it would be paid for its charges and costs for the asbestos-related downtime for remaining on-site from September 1 through November 18, 2011 while the PBC and Harbour allegedly performed asbestos abatement activities.

298.    DT as never been paid for any of those charges, including its lost profits from other jobs that it had to forgo amounting to $70,000.

299.    Harbour, Jr. has further testified that Harbour knew during the autumn of 2011 that DT was suffering financial hardship because it had not been paid for those charges, as well as for additional monies that were then-owed through the Optimal contract.

300.    As a direct and proximate result of Harbour's repeated and continuing refusal to pay DT for those charges, DT was unable even to bid on any additional geothermal projects and was effectively forced out of business altogether by December, 2011 because of DT's lack of working capital; DT having exhausted all of

68

its financial resources to cover its labor, equipment and other costs out of those financial resources from May through November, 2011 because it was not, and still is not being paid by Harbour for its costs and damages resulting from the asbestos-related downtime.

301.     As a direct and proximate result of Harbour's repeated false and fraudulent misrepresentations, DT has been damaged in the amount of its $235,000 in charges resulting from the asbestos related downtime plus DT's approximately $70,000 in lost profits from other projects that it was forced to forgo during the asbestos-related downtime as well as DT's damages resulting from being forced out of business altogether in an amount to be determined after trial.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against the defendants PBC and Harbour, and the award of compensatory damages in the amount of at least $305,000, punitive damages in the amount of $2 million, plus DT's costs.

## COUNT VI – TORTIOUS INTERFERENCE
## WITH DT/OPTIMAL CONTRACT – PBC AND HARBOUR

302.     Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-255 as though the same were fully set forth herein as ¶ 302 of Count VI.

303.     At all times from May through November, 2011, the PBC and Harbour were aware of DT's valid and enforceable subcontract with Optimal.

304.     To the extent that the agreement that DT negotiated directly with Harbour and the PBC without the involvement of Optimal for payment for the

undisclosed, underground vertical and horizontal obstructions is deemed still to be subsumed within the DT/Optimal subcontract, then as part of their individual and collective fraudulent schemes, as more fully set forth above, to shift to their geothermal subcontractors the costs of both relocating drill rigs and the trenching for the piping connecting the geothermal boreholes due to the undisclosed, underground vertical and horizontal obstructions, the PBC and Harbour intentionally and unjustifiably caused, and continue to cause Optimal to breach its contract with DT by their continuing (at least through April, 2015), repeated refusals to properly process and pay Optimal's change orders which incorporate DT's invoices for the extra costs resulting from the undisclosed, underground horizontal and vertical obstructions, falsely stating, *inter alia* that DT is not entitled to payment.

305.    To the extent that the agreement that DT negotiated directly with Harbour without the involvement of Optimal for payment for asbestos-related downtime is deemed still to be subsumed within the DT/Optimal subcontract, then as part of their individual and collective fraudulent schemes, as more fully set forth above, to shift to their geothermal subcontractors the costs of both completing the geothermal work in the presence of asbestos-contaminated soil, and of retaining DT on the Project site throughout the autumn of 2011 so that DT could immediately resume work once the PBC, aided by EDI, and/or Harbour aided by Dimos, could convince OSHA that it was safe for DT to resume work on the Project, the PBC and Harbour intentionally and unjustifiably caused, and continue to cause Optimal to

70

breach its contract with DT by the PBC's and Harbour's repeated and continuing (at least through April, 2015), refusals to pay Optimal for DT's asbestos-related downtime, as well as DT's lost profits from other work that it had to forgo because it was not released from the Project, falsely stating, *inter alia* that DT is not entitled to such payment.

306.     As a direct and proximate result of Optimal's breach of its contract with DT wrongfully caused by Harbour's and the PBC's tortious interference with that contract, DT has been damaged in the amount of approximately $400,000 plus DT's damages, to be determined after trial, for being forced out of business.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against the defendants PBC and Harbour, and the award of compensatory damages in the amount of at least $400,000, and $2 million in punitive damages, plus DT's costs.

**In the Alternative to Counts VI and VIII:**

### COUNT VII – TORTIOUS INTERFERENCE
### WITH HARBOUR/OPTIMAL CONTRACT – PBC

307.     Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-255 as though the same were fully set forth herein as ¶ 307 of Count VII.

308.     At all times from May through November, 2011, the PBC knew that DT was a third-party beneficiary of the Harbour/Optimal subcontract.

309.     To the extent that the agreement that DT negotiated directly with Harbour and the PBC without the involvement of Optimal for payment for the

undisclosed, underground vertical and horizontal obstructions is deemed still to be subsumed within the DT/Optimal subcontract, then as part of the PBC's fraudulent schemes, as more fully set forth above, to shift to its geothermal subcontractors the costs of both relocating drill rigs, and the trenching for the piping connecting the geothermal boreholes due to the undisclosed, underground vertical and horizontal obstructions, the PBC intentionally and unjustifiably caused, and continues to cause Harbour and Optimal to breach their contractual obligations to DT as a third-party beneficiary of their contract by the PBC's continuing (at least through April, 2015), repeated refusals to properly process and pay Optimal's change orders which incorporated DT's invoices for the extra costs resulting from the undisclosed, underground horizontal and vertical obstructions, falsely stating, *inter alia* that DT is not entitled to payment.

310.    To the extent that the agreement that DT negotiated directly with Harbour without the involvement of Optimal for payment for DT's asbestos-related downtime is deemed still to be subsumed within the DT/Optimal subcontract, then as part of the PBC's fraudulent schemes, as more fully set forth above, to shift to its geothermal subcontractors its increased Project costs due to the undisclosed asbestos on site, the PBC intentionally and unjustifiably caused, and continues to cause Harbour and Optimal to breach their third-party contractual obligations to DT as a third-party beneficiary of their contract by the PBC's repeated and continuing (at least through April, 2015), refusal to pay Harbour and Optimal for DT's asbestos-related downtime, as well as DT's lost profits from other work that it

72

had to forgo because it was not released from the Project, the PBC falsely stating, *inter alia*, that DT is not entitled to such payment.

311.     As a direct and proximate result of Harbour's and Optimal's breach of their contractual obligations to DT as a third-party beneficiary of their contract, wrongfully caused by the PBC's tortious interference with that Harbour/Optimal contract of which DT was a third-party beneficiary, DT has been damaged in the amount of approximately $400,000 plus its damages, to be determined after trial, for being forced out of business.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against defendant PBC, and the award of compensatory damages in the amount of at least $400,000, and $2 million in punitive damages, plus DT's costs.

**In the Alternative to Counts VI and VII:**

### COUNT VIII – TORTIOUS INTERFERENCE
### WITH DT/HARBOUR CONTRACTS – PBC

312.     Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-255 as though the same were fully set forth herein as ¶ 312 of Count VIII.

313.     At all times from May through November, 2011, the PBC knew that DT had entered into direct contracts with Harbour to be paid for both relocating its drill rigs and for additional trenching work and costs due to the undisclosed, underground horizontal and vertical obstructions.

314.     At all times from September through November, 2011, the PBC knew

73

that DT had entered into a direct contract with Harbour to be paid for its asbestos-related downtime.

315.    As part of its fraudulent schemes, as more fully set forth above, to shift to its geothermal subcontractors both the costs of relocating drill rigs and trenching for the piping connecting the geothermal boreholes due to the undisclosed, underground vertical and horizontal obstructions, and the PBC's increased costs resulting from the undisclosed asbestos, the PBC intentionally and unjustifiably caused, and continues to cause Harbour to breach its contracts with DT by the PBC's continuing (at least through April, 2015), its repeated refusals to properly process and pay both Optimal's change orders, which incorporate DT's invoices, as submitted by Harbour as requests for payment for DT's extra costs resulting from the undisclosed, underground horizontal and vertical obstructions, as well as DT's invoices submitted to Harbour, then submitted to the PBC as Harbour's requests for payments for DT's asbestos-related downtime.

316.    As a direct and proximate result of Harbour's breach of its contracts with DT, wrongfully caused by the PBC's tortious interference with DT's contracts with Harbour, DT has been damaged in the amount of approximately $400,000 plus its damages, to be determined after trial, for being forced out of business.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against defendant PBC, and the award of compensatory damages in the amount of at least $86,204, and $2 million in punitive damages, plus DT's costs.

74

## COUNT IX – UNJUST ENRICHMENT – PBC and HARBOUR

317.     Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-255 as though the same were fully set forth herein as ¶ 317 of Count IX.

318.     As set forth above, PBC and Harbour have gained substantial benefits from DT's supplying labor, materials and expertise to the Project, and for remaining on site as Harbour and the PBC requested so that DT was available to resume work immediately if given clearance regarding the asbestos on the Project site, whereas, DT has sustained a detriment of at least approximately $400,000, including being forced out of business because of the PBC's and Harbour's failure and refusal to pay DT those charges, costs, and lost profits from both 2011 and future projects.

319.     Additionally, Harbour is currently in litigation with the PBC and it is attempting to recover, *inter alia*, at least a portion of DT's charges for the undisclosed, underground vertical and horizontal obstructions, as well as at least a portion of DT's charges for its asbestos-related downtime and lost profits from other projects that it had to forgo because it was not released from the Project.

320.     On information and belief based on Harbour, Jr.'s May, 2015 deposition testimony, Harbour intends to retain whatever money it recovers from the PBC for those charges (which belong to DT), and not pay those funds over to DT, or to Optimal for payment to DT.

321.     It would be unjust and inequitable to allow Harbour to retain any funds that it has recovered, or that it may recover in the future for DT's remaining charges for the Project, *i.e.*, DT's charges for the undisclosed, underground vertical

75

and horizontal obstructions, as well as its charges for its asbestos-related downtime and lost profits from other projects which DT seeks to recover here, and it would also be unjust and inequitable to allow the PBC and Harbour to retain the benefits that DT has conferred upon them as set forth above without paying DT for those benefits.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against the defendants PBC and Harbour, and the award of compensatory damages in the amount of at least $400,000, plus DT's costs.

## COUNT X – PROMISSORY ESTOPPEL – PBC and HARBOUR

322.    Plaintiff DT repeats and realleges ¶¶ 1-24, 30-34, 74-255 as though the same were fully set forth herein as ¶ 322 of Count X.

323.    The PBC, and Harbour, were fully informed of: i) DT's relocation of its drill rigs because of undisclosed, underground vertical obstructions; and ii) the additional trenching needed, plus the removal of the resulting excess spoils and the need for additional fill because of the undisclosed, underground horizontal obstructions were all outside the scope of DT's contract with Optimal and that DT expected to be paid for those relocations as work outside the scope of the Optimal contract.

324.    The PBC, and Harbour, directed DT to proceed with the work knowing that DT expected to be paid for it.

325.    DT reasonably relied on those directions to continue its work and performed the necessary drill rig relocations and additional trenching activities.

76

326.     PBC and Harbour were also aware that a stop work order had been issued on or about September 1, 2011 because of the asbestos that DT encountered on the Project site which precluded further work.

327.     After the stop work order issued, Harbour and PBC through its agent, Harbour, refused to release DT from the Project so that DT could perform other work because Harbour and the PBC wanted DT to remain on the Project site to be able to resume work immediately once asbestos-related conditions allowed.

328.     Both Harbour and the PBC were also well aware that DT expected to be paid for all downtime from September through November 18, 2011 at a rate of $4200 per day (representing DT's actual payroll and equipment costs) – a total of $235,000 – because Shelton and Karaskiewicz had directly negotiated and agreed to that daily amount outside the Optimal contract and without Optimal's involvement.

329.     Both Harbour and the PBC were also well aware that DT was losing profits on other work because they had not released DT from the Project because DT repeatedly, expressly informed Harbour of that fact, and Shelton expressly informed Karaskiewicz on or about November 1, 2011 that DT's lost profits to date were $70,000.

330.     Nevertheless, Harbour, on behalf of itself, and PBC, not only continued to refuse to release DT from the Project from September 1 through November 18, 2011, but Harbour, Jr. has testified that, on November 1, 2011 during a meeting with Shelton to persuade Shelton and DT to return after Rae had summarily ordered them off the Project altogether, Harbour, Jr. reaffirmed the obligation to

77

pay DT its charges for the vertical and horizontal obstructions, as well as DT's charges and costs for the asbestos-related downtime by telling Shelton that he, Harbour, Jr, would work out all of the issues delaying DT's payments and would get DT its money.

331.   DT reasonably relied on Harbour and the PBC's repeated representations beginning in early May, 2011 and continuing through November 1, 2011 that it would be paid for its charges for the vertical and horizontal obstructions, as well as for its charges and costs for the asbestos-related downtime by performing the necessary drill rig relocations because of the undisclosed, underground vertical obstructions and the additional trenching activities (while incurring additional cost of those trenching activities), plus remaining on-site from September 1 through November 18, 2011 while the PBC and Harbour allegedly performed asbestos abatement activities.

332.   DT as never been paid for any of those charges.

333.   Harbour, Jr. has further testified that Harbour knew that DT was suffering financial hardship because it had not been paid for those charges, as well as for additional monies that were then-owed through the Optimal contract.

334.   As a direct and proximate result of the PBC's and Harbour's repeated and continuing refusal to pay DT for those charges, including most recently, on or about December 17, 2014, as revealed in Griderof's April, 2015 deposition, DT was unable even to bid on any additional geothermal projects and was effectively forced out of business altogether by December, 2011 because of its lack of working capital;

78

DT having exhausted all of its financial resources to cover its labor, equipment and other costs out of those financial resources from May through November, 2011 because it was not, and still is not being paid by the PBC and Harbour for its costs for the undisclosed, underground vertical obstructions and the additional trenching activities (while incurring additional cost of those trenching activities), plus the costs and damages resulting from the asbestos-related downtime.

335.    As result, Harbour and the PBC should now be estopped from denying their obligation to pay DT: i) its $86,204 in charges for the undisclosed, underground horizontal and vertical obstructions; ii) its $235,000 in charges resulting from the asbestos related downtime; iii) its approximately $70,000 in lost profits from other projects that it was forced to forgo during the asbestos-related downtime; and iv) its damages from being forced out of business altogether in an amount to be determined after trial.

WHEREFORE, plaintiff DT Boring, Inc. respectfully requests the entry of judgment in its favor and against the defendants PBC and Harbour, and the award of compensatory damages in the amount of at least $400,000, plus DT's costs.

## JURY DEMAND

Plaintiff DT Boring, Inc. hereby demands trial by jury.

Respectfully submitted,

DT Boring, Inc.

/s/   Bruce Rose

79

Bruce Rose
The Law Office of Bruce Rose
10560 W. Cermak Road
Westchester, IL 60154
708.562.9880
Atty. No. 3125523