IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DT BORING, INC.,                                    )
                                                    )
                        Plaintiff,                  )        Case No.  15 C 11222
            v.                                      )
                                                    )        Judge Robert W. Gettleman
THE CHICAGO PUBLIC BUILDING                         )
COMMISSION, HARBOUR CONTRACTORS,                    )
INC., an Illinois corporation,                      )
ENVIRONMENTAL DESIGN                                )
INTERNATIONAL, INC., an Illinois corporation,       )
and JOHN DIMOS, an individual,[1]                    )
                                                    )
                        Defendants.                 )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff DT Boring, Inc. ("DT Boring") filed a ten-count complaint against defendants

The Chicago Public Building Commission ("PBC"), Harbour Contractors, Inc. ("Harbour"),

Environmental DesigInternational, Inc. ("EDI"), and John Dimos, alleging that Harbour, EDI,

and Dimos violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962

("RICO"), (Counts I, II, and III), PBC and Harbour engaged in common law fraud (Counts IV

and V), and PBC and Harbour tortiously interfered with contractual relations (Counts VI, VII,

and VIII).  Plaintiff also asserts claims for unjust enrichment (Count IX) and promissory

estoppel (Count X) against PBC and Harbour.  All defendants have filed separate motions to

dismiss plaintiff's complaint.[2]  Plaintiff has also filed a motion to disqualify Duane Morris, LLP

---

[1]A summon was issued to defendant Dimos on February 4, 2016.  Service, however, was
never returned executed and Dimos has not filed an appearance in this matter.

[2]In addition to asserting independent grounds upon which plaintiff's complaint should be
dismissed, defendant EDI also adopts Harbour and PBC's arguments for dismissal.
The court notes that Harbour's brief in support of its motion to dismiss (doc. 31) violates
(continued...)

("Duane Morris"), Charles Lewis, Adam Gill, and Ben Johnston as counsel for Harbour. For the reasons discussed below, the court denies plaintiff's motion to disqualify, denies PBC's motion to dismiss, and grants in part and denies in part EDI's and Harbour's motions to dismiss.

## BACKGROUND[3]

Plaintiff is an Illinois corporation that consults on geothermal energy, as well as designs, drills, and installs geothermal well fields and geothermal heating and ventilation systems for governmental, commercial, and residential structures. Tom Shelton and his wife own plaintiff in joint tenancy. In October 2010, Shelton received from Optimal Energy, LLC ("Optimal") an abbreviated version of bid documents produced by defendant PBC, a municipal corporation that controls and oversees the construction and renovation of public buildings in Chicago, for construction of the 12th District Police Station in Chicago, Illinois (the "12th District Project"). Optimal subsequently sent Shelton a draft subcontractor's agreement, under which plaintiff would act as a subcontractor for Optimal on the 12th District Project, performing the drilling of 88 geothermal boreholes and other related work.

Included with the draft subcontractor agreement were revised plans for the geothermal portion of the 12th District Project taken from PBC's bid documents. The revised bid documents stated that the property on which the police station was to be built had previously contained

---

[2](...continued)
Local Rule 7.1, as it exceeds the page limit without prior approval of the court and includes neither a table of contents nor a table of cases. Harbour is admonished that the rules of this court apply to it as they do to any litigant.

[3]The following facts are taken from plaintiff's complaint and are assumed to be true for purposes of defendants' motions to dismiss. See Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995).

Chicago Housing Authority ("CHA") residential buildings that had been removed from the site in 2009. In addition, the bid documents stated that "[r]emaining subsurface structures were removed in April 2010 [from the property] as a part of the site preparation for the construction of the 12th District Police Station." Plaintiff alleges that it relied on these statements when preparing and submitting its revised bid to Optimal. Plaintiff subsequently entered into a contract with Optimal to perform the above referenced work for the 12th District Project. Optimal in turn entered into a subcontract with defendant Harbour, which served as the general contractor for the 12th District Project.

Plaintiff alleges that the revised bid documents fraudulently asserted that the "remaining subsurface structures" from the residential housing on the project site had been removed. According to the complaint, "numerous, steel rebar-reinforced, concrete foundations from those [residential] buildings remained buried on the site several feet below grade." The complaint further alleges that "buried several feet below ground . . . were numerous asbestos-wrapped steam pipes."

Plaintiff alleges that PBC, Harbour, and EDI, which was hired to complete pre-construction environmental testing on the project site, knew about both the underground concrete obstructions and asbestos prior to PBC preparing the project's bid documents. Months before the residential housing buildings were demolished, PBC and EDI allegedly received site plans from the CHA identifying the asbestos-wrapped steam lines. The complaint alleges that in April 2009, PBC and EDI "agreed that EDI would do environmental test borings around the Project site looking for contaminated soil, but that the test borings would deliberately avoid coming near the underground, asbestos-wrapped steam lines." Plaintiff further alleges that EDI hired a

subcontractor during its environmental testing that identified 36 underground anomalies during testing on the project site, and therefore recommended further testing on each anomaly. EDI and PBC, however, "agreed that EDI would do test borings near only 17 of the 36 'anomalies' . . . to avoid 'discovering' the underground, asbestos-wrapped steam lines." According to the complaint, EDI, "in order to satisfy PBC, a major customer, . . . states whatever is necessary to protect PBC's position" with respect to the environmental conditions of PBC's projects.

## 1. Drill Rig Relocation

The complaint alleges that "within days" of beginning work on the 12th District Project site in May 2011, plaintiff "encountered the first of the underground steel rebar-reinforced underground obstructions." After finding the obstruction, plaintiff alleges that Shelton immediately notified Harbour's project manager, "explaining that the obstruction had not been disclosed on any of the bid documents given to Shelton." Plaintiff alleges that an "on-site meeting" between Harbour, PBC, and plaintiff then occurred, during which Harbour and PBC agreed to have plaintiff "relocate its drilling rigs anywhere within a 2-foot radius of the original, specified location for the borehole."

According to the complaint, a day after the on-site meeting, Shelton spoke with PBC's assistant project manager Andy Horn, who inquired about how much it would cost PBC for plaintiff to relocate its drilling rigs when it encountered the previously undisclosed underground obstructions. Shelton told Horn that plaintiff would charge a flat three hours of time at a cost of $1,650 for each drill rig plaintiff had to relocate, plus the additional cost of removing excess soil. Horn allegedly agreed to pay plaintiff at this rate. The complaint alleges that on May 26, 2011, "Shelton received an email over the interstate wires that contained another email, also sent over

4

the interstate wires, dated May 17th, 2011, and sent from Horn to [James] Harrell [PBC's project manager], and other PBC staff members expressly authorizing [plaintiff] to relocate its drilling rigs a maximum of 2 feet in any direction in order to avoid undisclosed, underground obstructions."

Plaintiff alleges that in early June 2011 Shelton inquired with Harbour's project manager, Sam Rae, as to why plaintiff had not received written field orders from Harbour for the drill rig relocations. Rae allegedly informed Shelton that "Harbour had not issued any Field Orders because Harbour had to 'package' [plaintiff's] drill rig relocation costs as change orders with other subcontractors' change orders, before submitting them all to the PBC for payment." According to the complaint, "Rae told Shelton again that [plaintiff] would be paid for its drill rig relocation costs, and he also told Shelton to have [plaintiff] continue with its work including relocating the drill rigs when necessary." As a result, plaintiff alleges that it continued drilling the remaining 88 boreholes for the 12th District Project.

The complaint alleges that PBC's and Harbour's statements to plaintiff orally authorizing the drill relocation and agreeing to pay plaintiff for the extra work "were all intentionally false and fraudulent when made." Plaintiff alleges that the statements were intended to induce it to continue drilling the boreholes, but that PBC and Harbour had no intention of paying for the work. According to the complaint, "Rae, on behalf of Harbour, and Harrell, on behalf of the PBC, had already made a secret agreement [that] when [plaintiff] encountered the first of the undisclosed, underground obstructions that the PBC and Harbour would deliberately withhold all payments for [plaintiff's] drill rig relocations until [plaintiff] had completed all of its work on the geothermal portion of the Project . . . in the hope that no payment would be necessary because of

a credit owed to PBC by Optimal." Plaintiff alleges that "Harbour and the PBC hoped that Optimal's credit owed to the PBC would fully offset the amount owed to [plaintiff] for the drill rig relocations so that the PBC would not have to pay [plaintiff] anything" for the extra work.

Unaware of this agreement, plaintiff alleges that it continued to submit timely invoices for the extra work to Optimal as directed by Rae. "In reality, Rae and Harbour directed [plaintiff] to submit its invoices to Optimal for transmission to Harbour simply to ensure that payments for [plaintiff's] drill rig relocation costs had to pass through Optimal so that those payments could be offset by Optimal's credit owed to the PBC." The complaint alleges that into September 2011 Harbour continued to assure plaintiff that it would be paid for the extra work, but that it was still "packaging" plaintiff's change orders. Specifically, plaintiff alleges that Rae sent Shelton an email on September 14, 2011, stating that "Harbour was waiting for the necessary backup and documentation for each change order," and that it was "Harbour's opinion that the additional work was performed, and that the PBC was aware that the work was taking place." These statements, plaintiff alleges, were made "to fraudulently induce [it] to continue working on the Project."

According to the complaint, plaintiff's additional costs associated with the undisclosed obstructions "quickly exceeded the amount of any credit that Optimal owed to the PBC." As a result, plaintiff alleges that Harbour began submitting the change orders to PBC, that were then rejected "with a 'wink and a nod' as 'insufficient.'" The complaint alleges, however, that on September 21, 2011, during a meeting at Harbour's headquarters with Harbour project executive Mark Karaskiewicz, Rae, and two principals from Optimal, Rae "expressly stated that the change

orders had been 'approved' by Harrell and were being sent downtown to the PBC for 'final approval' and payment."

## 2.      Asbestos-Related Downtime

The complaint alleges that in August 2011, while working on the trenches, Shelton discovered a large pipe encased in wrapping that was later determined may be asbestos. EDI was subsequently called to the site to examine the piping insulation, concluding before samples were sent to the lab that the asbestos was non-friable, meaning that it could not move through the air, and therefore was not dangerous. The area where the pipe was located was cordoned off and plaintiff was ordered to resume work in a different area of the project. Because only limited work could be completed in that area, plaintiff alleges that with the exception of Shelton, all of its crew "had to stand idle."

The next day, on September 1, 2011, Optimal personnel examined the trenches in which plaintiff's employees had been working for several weeks, and concluded that they too may contain asbestos. Plaintiff alleges that Optimal issued a formal Notice of Delay, halting plaintiff's work on the project. EDI, however, once again declared that the asbestos was non-friable, informing Harbour, Optimal, and plaintiff that work on the trenches could continue if plaintiff's employees worked downwind. Harbour issued a formal back to work order on September 2, 2011.

Plaintiff alleges that on September 9, 2011, the Occupational Safety and Health Administration ("OSHA") conducted a site visit and concluded that friable asbestos was present in significant quantities on the project site. That same day, Optimal received test results from samples it had taken, which also showed the presence of friable asbestos. The complaint alleges

that Optimal issued a stop work order that day. Harbour subsequently "agreed that the stop work order could remain in effect until [ ] abatement measures had been taken to remove the asbestos-contaminated soil." Following the stop work order, plaintiff alleges that "Shelton repeatedly told Harbour – and specifically Karaskiewicz – that, because [plaintiff] had not been released from the Project, [it] had to continue paying its employees even while they were unable to work."

According to the complaint, during a September 21, 2011, meeting at Harbour's headquarters, Karaskiewicz inquired about plaintiff's per diem costs resulting from Harbour's decision not to release it from the project. Shelton allegedly reported that it cost plaintiff approximately $4,200 per day to have its employees and equipment sit idle, which plaintiff alleges Harbour subsequently agreed to pay. The complaint alleges that plaintiff's employees and equipment sat idle from September through November 18, 2011, at which time plaintiff was terminated from the project. Plaintiff, however, alleges that defendants continued to fraudulently represent, as late as January 26, 2012, that it would be paid for its extra work and down-time related to the undisclosed obstructions.

### 3. RICO Scheme

The complaint alleges that neither Harbour nor PBC has ever paid plaintiff for the money owed to it for the extra work associated with the undisclosed underground obstructions or asbestos-related downtime. As a result of the non-payment, plaintiff alleges that its working capital was exhausted and it was forced out of business. Plaintiff alleges that defendants' actions on the 12th District Project were consistent with a greater fraudulent scheme perpetrated by defendants. Specifically, the complaint alleges that PBC heads and controls a RICO enterprise made up of a group of "second-tier" pre-approved general contractors such as Harbour and

"third-tier" minority/women owned subcontractors such as Optimal, as well as consultants like EDI. According to the complaint, "the goal of the enterprise, through fraud and extortion, is to benefit the PBC by constructing and/or renovating public buildings . . . at or below their actual construction cost while enriching both the second tier general contractors, and the third tier minority/women owned subcontractors at the expense of the bottommost project subcontractors."

The process by which the enterprise allegedly accomplishes this goal begins with PBC requesting project bids from a group of general contractors, including those that are a part of the RICO enterprise. The general contractors subsequently request preliminary bids from the third-tier minority/women owned subcontractors, also a part of the enterprise, who in turn request bids from the lower-tier subcontractors, such as plaintiff. The lower-tier subcontractors then submit their bids, with a reasonable profit margin, to the third-tier subcontractors. The second-tier general contractor, however, demands that the lower-tier subcontractors reduce their bids in order to be included in the general contractor's overall bid to PBC. The lower-tier subcontractors do so by eliminating their own profit margins. The general contractor subsequently submits its overall proposed bid to PBC, fraudulently leaving out its own profit margin to ensure that it is the lowest bidder.

Plaintiff alleges that once PBC awards the project to the RICO enterprise general contractor, the general contractor is tasked with both ensuring that the project is completed at or below the actual construction cost so as to benefit PBC and regaining its own profit margins that were intentionally omitted from its bid. To accomplish this, plaintiff alleges that the general contractor extorts funds and performance from the lower-tier subcontractors by: (a) "refusing to process change orders approving work performed outside the scope of the original contracts and

subcontracts so that PBC gets the benefit of additional work and materials for free";

(b) "trumping up phony 'back charges' for the subcontractor's purportedly defective work so the

general contractor can withhold the amount of those fraudulent back charges"; (c) "refusing to

pay the subcontractor at all"; and/or (d) "agreeing to pay the retainage, change orders and/or

amounts due, but only if the subcontractor agrees to a 'buyout' which is a reduction in the

amount owed to the subcontractor."

In November 2012, plaintiff filed a lawsuit against Travelers Casualty and Surety Co. of

America ("Travelers") in the Circuit Court of Cook County seeking to recover under the

performance and payment bond that Travelers issued for PBC's benefit on the 12th District

Project and on which Harbour was the principal. DT Boring, Inc. v. Travelers Casualty and

Surety Co. of America, No. 12 L 12781. Plaintiff thereafter, in January 2013, filed an action in

this court against Optimal, PBC, Harbour, and EDI, alleging most of the same causes of action

presently before the court. DT Boring, Inc. v. Chicago Public Building Commission, No. 13-C-

450 ("DT Boring I"). On October 28, 2013, this court dismissed DT Boring I pursuant to Rule

12(b)(1) for lack of RICO standing because plaintiff was pursuing collateral sources of recovery.

DT Boring, Inc. v. Chicago Public Building Commission, No. 13-C-450, 2013 WL 5835703

(N.D. Ill. Oct. 28, 2013).

## DISCUSSION

### 1.    Motion to Disqualify

Plaintiff argues that Duane Morris, and the attorneys from Duane Morris, which the court

will refer to collectively as "Duane Morris," should be disqualified from representing Harbour

because counsel will be called to testify as necessary witnesses at trial. Plaintiff also argues that

disqualification is necessary because Duane Morris has a conflict of interest with both Harbour and its former client, Travelers.

Although plaintiff's complaint does not name Duane Morris, or any of its attorneys, as defendants, it contains factual allegations concerning actions Duane Morris allegedly took in connection with its representation of Harbour and Travelers in plaintiff's state court action and previously dismissed federal action. Summarily, the complaint alleges that Duane Morris delayed asserting defenses Travelers had in plaintiff's state court case in order to defeat plaintiff's first federal action. The complaint further alleges that Duane Morris, as counsel for Travelers, improperly asserted a lack of knowledge in its answer to plaintiff's state court complaint and improperly responded to discovery requests. Plaintiff's complaint alleges that these "deceptive actions" were "committed on behalf of Harbour as a continuation . . . of Harbour's RICO and other tortious activities." According to the complaint, Duane Morris's actions "were intended at least to delay, if not prevent altogether DT from collecting all of its damages."

Harbour first argues that plaintiff's motion should be denied because plaintiff's complaint "contains no allegations that Duane Morris aided Harbour in committing predicate acts or failed to stop a predicate act." While it is unclear to the court how Duane Morris's actions while defending Travelers and Harbour in litigation related to the present case can form the basis of plaintiff's RICO claims against Harbour, the court need not reach this issue. As Harbour contends, it is premature at this stage of the litigation to disqualify Duane Morris based on the possibility that its attorneys may testify at trial in the future. Model Rule of Professional Conduct 3.7(a) provides that "A lawyer shall not act as advocate at a trial in which the lawyer is

likely to be a necessary witness."[4]  Because the instant action is merely in the pleading stage, and

Rule 3.7 speaks of disqualification only at trial, plaintiff's motion is premature.  ABA Model

Rule 3.7; see also Mercury Vapor Processing Tech., Inc. v. Village of Riverdale, 545 F. Supp. 2d

783, 788-89 (N.D. Ill. 2008) (holding that the local rule prohibiting a lawyer-witness from acting

as an advocate in a trial or evidentiary hearing does not prohibit the attorney from handling other

phases of the litigation).

       Plaintiff next argues that Duane Morris should be disqualified from representing Harbour

because it has a conflict of interest with both Harbour and its former client Travelers.  According

to plaintiff, "Duane Morris and its attorneys have an interest in concealing their misconduct,

possibly by pointing the finger at either or both Harbour and Travelers as directing, or ratifying

their conduct."  Plaintiff argues that "[w]hether by protecting themselves, and/or by endeavoring

to shift blame to their present or former clients, Duane Morris and its attorneys clearly have a

concurrent conflict."

       Generally, only a current or former client has standing to seek disqualification of an

attorney based on a conflict of interest.  See Tizes v. Curico, No.  94-C-7657, 1997 WL 116797,

at *2 (N.D. Ill. Mar. 12, 1997); see also Mills v. Hausmann-McNally, S.C., 992 F. Supp. 2d 885,

891 (S.D. Ind. 2014).  "The majority position draws its strength from the logic of the Rule itself,

which is designed to protect the interests of those harmed by conflicting representations rather

than serve as a weapon in the arsenal of a party opponent."  Mills, 992 F. Supp. 2d at 891.

Nonetheless, courts in this district have concluded that "[w]here the conflict is such as to clearly

---

[4]Local Rule 83.50 provides that the "applicable disciplinary rules are the model rules
adopted by the American Bar Association."

call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." Blanchard v. EdgeMark Fin. Corp., 175 F.R.D. 293, 306 (N.D. Ill. 1997).

Plaintiff, however, has not identified a conflict that clearly calls into question the fair or efficient administration of justice, and therefore lacks standing to seek disqualification of Duane Morris as Harbour's counsel. As noted above, while plaintiff's complaint includes factual allegations concerning Duane Morris's actions in earlier litigation, it does not assert a cause of action against Duane Morris. Instead, plaintiff's complaint alleges only that Duane Morris's actions were "committed on behalf of Harbour as a continuation . . . of Harbour's RICO . . . activities." Liability under plaintiff's RICO allegations, therefore, arises not from Duane Morris's actions, but from Harbour's alleged actions in supposedly orchestrating its defense to plaintiff's lawsuits to further delay plaintiff's recovery under the contract. As a non-party to this lawsuit, it is unclear to the court, and not articulated by plaintiff, why Duane Morris would be inclined to protect itself from anything.

Moreover, as discussed above, the court is not convinced at this early stage of the case how Duane Morris's failure to raise a defense within the time period preferred by plaintiff or properly respond to discovery or answer a complaint can form the basis of a RICO claim. It seems obvious to the court that had plaintiff taken issue with Duane Morris's litigation tactics during the earlier two lawsuits, it could have sought a remedy in those venues, such as through a motion to strike or compel. As such, the court is not persuaded at this time that such a "drastic measure" as disqualification is "absolutely necessary." Owen v. Wangerin, 985 F.2d 312, 317 (7th Cir. 1993) (internal quotations omitted). Consequently, plaintiff's motion to disqualify Duane Morris and its attorneys as counsel for Harbour is denied without prejudice.

## 2. Motions to Dismiss

### A. Collateral Sources of Recovery

Defendants[5] each argue, in some fashion, that plaintiff's three RICO claims should be dismissed because plaintiff has failed to exhaust other sources of recovery. The civil RICO statute provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). In evaluating RICO causation – whether an alleged RICO injury was caused "by reason of" a violation of the statute – the Supreme Court has held that a defendant's RICO violation, must not only be the "but for" cause of the plaintiff's injuries, but also the "proximate cause." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 276 (1992) (holding that because the alleged conspiracy did not proximately cause the injury claimed, plaintiff "failed[ed] to make out a right to sue [the defendant] under § 1964(c)").

The Seventh Circuit has held that to satisfy the proximate cause component, a plaintiff's RICO injury requires proof of "a concrete financial loss." Evans, 434 F.3d 916, 932 (7th Cir. 2013) overruled on other grounds by Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013) (internal quotations omitted). As a part of this discussion, the Evans court cited the Second Circuit's

---

[5]PBC, although not named as a RICO defendant, has moved to dismiss plaintiff's RICO claims pursuant to Rule 41(b) for failure to comply with the court's order in DT Boring I. Specifically, PBC's motion first argues that this court's earlier dismissal in DT Boring I was with prejudice, and alternatively that plaintiff failed to comply with the court's order in DT Boring I to exhaust collateral sources of recovery. PBC appears to have withdrawn its first argument in its reply brief. Because PBC's alternative argument is related to EDI's and Harbour's arguments addressed in this section, the court does not address PBC's Rule 41(b) motion separately.

standard requiring the amount of RICO damages to be "clear and definite" as articulated in

Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003).

Relying on the Motorola case, defendants argue, as they did when moving to dismiss

plaintiff's first federal action, that "[a] RICO plaintiff has no standing to bring its claims, until it

exhausts all other means of recovery for its alleged injuries." According to defendants, without

exhausting all other sources of recovery, a plaintiff's damages cannot be "clear and definite."

Defendants contend that because plaintiff failed to pursue its Mechanic's Lien claim or file

breach of contract claims against Optimal or Harbour, it has not exhausted its collateral sources

of recovery, and therefore does not have damages concrete enough for RICO standing.

The court, however, already rejected this argument in its October 28, 2013, memorandum

opinion and order in DT Boring I. Specifically, this court held that Motorola was not as broad as

requiring a plaintiff to exhaust every collateral source of recovery before pursuing RICO claims.

DT Boring, 2013 WL 5835703 at *4. Instead, the court held that "the rule in Motorola applies

and the plaintiff lacks RICO standing," only where "a plaintiff *seeks* repayment on the same debt

through two different sources." Id. (emphasis added). Contrary to PBC's position, nothing in

the court's 2013 memorandum opinion and order requires or states that plaintiff must exhaust all

possible collateral sources of payment prior to seeking relief pursuant to RICO.

Having abandoned its Mechanic's Lien claim and settled its bond case in state court,

plaintiff is currently seeking a single source of recovery. Unlike the plaintiff in Motorola, the

plaintiff here is not a secured creditor, and therefore its RICO damages are not "netted against

recovery obtained from collateral." Motorola, 332 F.3d at 135. Similarly, and unlike in

Motorola, there are no longer parallel legal proceedings that make the damages plaintiff seeks

indefinite. See id. at 136 (noting that the RICO damages the plaintiff sought are not definite because they may be abated by foreclosing on the secured collateral or by ongoing parallel arbitration). Consequently, the court denies defendants' motions with respect to this issue.

**B.      Statute of Limitations**

In direct contradiction to its argument that plaintiff's RICO claims are premature for failure to exhaust other sources of recovery, defendant Harbour also argues that the claims are barred by the statute of limitations. "Although the statute of limitations is an affirmative defense to liability and so ordinarily must be pleaded and proved by the defendant, if it is plain from the complaint that the defense is indeed a bar to the suit dismissal is proper without further pleading." Jay E. Hayden Foundation v. First Neighbor Bank, N.A., 610 F.3d 382, 383 (7th Cir. 2010). Because it is not evident from the complaint that plaintiff's RICO claims are untimely, the court denies Harbour's motion with respect to this argument.

RICO actions are governed by a four year statute of limitations. Jay E. Hayden, 610 F.3d at 383; Rotella v. Wood, 528 U.S. 549, 552–53 (2000). The limitations period begins to run when the plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to its claim and the injurer. Jay E. Hayden, 610 F.3d at 386. "The focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." Cancer Foundation, Inc. v. Cerberus Capital Mgmt., LP, 559 F.3d 671, 674 (7th Cir. 2009). Thus, the plaintiff need not know that the injury is actionable to trigger the statute of limitations. Id.

Additionally, it is "the injury arising from the first predicate act to injure the plaintiff (predicate acts are the illegal acts committed by the racketeering enterprise) [that] starts the limitations period running, rather than the injury from the last predicate act, which might occur

decades after the first." <u>Jay E. Hayden</u>, 610 F.3d at 386–87. Thus, a plaintiff need not know that he has been injured by a RICO violation (a pattern of racketeering activity), because the scope and nature of his legal claims are what it has four years to discover. <u>Id</u>. at 387.

Harbour argues that the limitations period commenced on numerous dates, the earliest of which was April 6, 2011, when plaintiff received the final project site plans for the 12th District Project from Optimal, and the last of which was when Harbour was removed from the job site on November 18, 2011. Harbour, however, does not explain, and the court cannot discern, how plaintiff knew it was injured on April 6, 2011, when it received the final project plans. Nor is it plain from the complaint that plaintiff knew of its injury upon discovery of the underground concrete obstructions or asbestos.

Construing all reasonable inferences in plaintiff's favor, the complaint alleges that defendants' RICO scheme consisted not only of concealing the condition of the project site so as to cause subcontractors to low-bid the cost of completing the work, but also defendants' continued false representations that they would pay for the extra work and down-time associated with the obstructions. Given defendants' alleged promises to pay, discovery of the obstructions alone would have been insufficient to put plaintiff on notice that it had been injured by Harbour. Similarly, because Harbour and the other defendants allegedly continued to reassure plaintiff that it would be paid for the work associated with the obstructions up until and after the time it was terminated from the project, the court cannot conclude that plaintiff knew of its injury on November 18, 2011, when it was terminated from the project.[6]

_____

[6]In apparent recognition of the fact that the allegations of the complaint alone do not establish a statute of limitations defense, Harbour asks the court in its reply brief to consider a

(continued...)

17

### C. Rule 9(b)

Harbour also argues that plaintiff's RICO claims should be dismissed for failure to plead fraud with particularity as required by Rule 9(b). Rule 9(b) requires a plaintiff alleging fraud to plead the "who, what, when, where, and how of the fraud." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014). Plaintiff has pled that defendants engaged in a pattern of racketeering through the predicate actions of wire and mail fraud. Accordingly, plaintiff's allegations of mail and wire fraud are subject to the heightened pleading standard set forth in Rule 9(b), which requires particularity. See Kaye v. D'Amato, 357 Fed.Appx. 706, 710 (7th Cir. 2009)

Relying predominantly on this court's opinion in Freedom Mortgage Corp. v. Burnham Mortgage, Inc., 720 F. Supp. 2d 978 (N.D. Ill. 2010), Harbour argues that plaintiff "does not allege any specific instances of fraud committed by Harbour," "explain[] how a single statement or communication made by Harbour, any person, or any other party was fraudulent," or how it relied on any misrepresentation to its detriment. Harbour's contentions, however, are both factually and legally incorrect.

As an initial matter, Freedom Mortgage is easily distinguishable from the instant case. The plaintiff's complaint in Freedom Mortgage, as this court explained in its opinion, made collective allegations against "the RICO Defendants," failed to specify the defendants' participation in the mail and wire fraud, and did not identify the specific mail or wire

---

[6](...continued)
number of emails in support of its timeliness argument. These materials, however, are outside the pleadings, and therefore not properly considered as a part of defendant's Rule 12(b)(6) motion. Of course, defendants may revisit the issue in a motion for summary judgment pursuant to Fed. R. Civ. P. 56 after discovery.

communications that allegedly were the predicate acts. 720 F. Supp. 2d at 995. Conversely, here plaintiff has made specific allegations with respect to each defendants' conduct and roll in the alleged scheme to defraud, identified each defendants' false statements and/or misrepresentations, and has specified the form, date, sender, and recipient of each of the offending mail and wire communications that make up the predicate acts.

Far from failing to identify "any specific instances of fraud committed by Harbour," plaintiff's entire RICO theory, as alleged in the complaint, is based on Harbour's participation in a scheme to defraud it and other lower-tier subcontractors. Specifically, the complaint alleges that Harbour, along with the other defendants, knew about the underground concrete obstructions and asbestos on the 12th District Project site prior to plaintiff beginning its work. Defendants, including Harbour, allegedly knew these obstructions would require additional work from plaintiff. Plaintiff further alleges that Harbour induced this extra work from plaintiff through false representations that it and/or PBC would pay for the work.

As a part of this scheme, the complaint alleges that Harbour made numerous false statements to plaintiff, including in early June 2011 when Rae stated to Shelton that "Harbour had not issued any Field Orders [for plaintiff's drill rig relocations] because Harbour had to 'package' DT's drill rig relocation costs as change orders with other subcontractors' change orders, before submitting them all to the PBC for payment." Plaintiff's complaint also alleges that Rae sent Shelton an email on September 14, 2011, stating that "Harbour was waiting for the necessary backup and documentation for each change order," and that it was "Harbour's opinion that the additional work was performed, and that the PBC was aware that the work was taking place." The complaint further alleges that on September 21, 2011, Rea "expressly stated [to

Shelton] that the change orders had been 'approved' by Harrell and were being sent downtown to the PBC for 'final approval' and payment," despite the fact that Harbour knew PBC would not approve the change orders. These allegations are sufficient to satisfy Rule 9(b)'s particularity requirements.

Contrary to Harbour's understanding of the law, plaintiff need not allege that the Harbour made false representations in a wire or mail communication. Instead, as explained by the Supreme Court, "[t]he gravamen of the [mail/wire fraud] offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) (internal quotations and citations omitted). Likewise, a plaintiff asserting a RICO claim predicated on mail fraud need not plead or prove that it relied on the defendant's alleged misrepresentations. Id. at 641-42. Consequently, the court denies Harbour's motion to dismiss for failure to comply with Rule 9(b).[7]

### D. RICO Elements

As discussed above, plaintiff's complaint asserts three RICO claims. The claims allege that defendants, by engaging in a scheme to defraud plaintiff and other lower-tier subcontractors, committed various acts of mail and wire fraud. See 18 U.S.C. §§ 1341, 1343. Mail and wire fraud are forms of "racketeering activity" for purposes of RICO. 18 U.S.C. § 1961(1)(B).

---

[7]The court likewise denies Harbour's motion to dismiss for failure to comply with Rule 8(a). Rule 8(a) requires only that a complaint contain, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). For the reasons discussed both in this section and below, plaintiff's complaint satisfies Rule 8.

Plaintiff alleges that defendants' conduct constituted a pattern of racketeering activity because the scheme was ongoing for years, involving multiple PBC projects.

Plaintiff asserts in its first cause of action that Harbour, EDI, and Dimos violated § 1962(b), which makes it unlawful for "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  Plaintiff's second cause of action is asserted against only Harbour, and alleges a violation of § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Finally, defendant's third RICO cause of action asserts that Harbour, EDI, and Dimos violated § 1962(d) which makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c)."

Despite the significant substantive differences among the numerous RICO provisions encompassed in § 1962, any successful RICO claim requires a plaintiff to prove four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  Kaye, 357 Fed.Appx. at 710.  Harbour and EDI argue that plaintiff has failed to sufficiently allege the existence of a RICO enterprise or that defendants engaged in a pattern of racketeering activity. The court begins by addressing whether plaintiff's complaint sufficiently alleges the existence of a RICO enterprise.

*RICO Enterprise*

Section 1961(4) defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Accordingly, the statute "allows for causes of action against both formal legal entities and informal associations-in-fact." Guaranteed Rate, Inc. v. Barr, 912 F. Supp. 2d 671, 686 (N.D. Ill. 2012). "The Supreme Court had held on multiple occasions that this definition is to be interpreted broadly." United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 853 (7th Cir. 2013). As held by the Supreme Court, "an 'association-in-fact' enterprise need not have any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" United Food, 719 F.3d at 853 (quoting Boyle v. United States, 556 U.S. 938, 946 (2009)).

Contrary to defendants' arguments, plaintiff's complaint sufficiently alleges an association-in-fact enterprise. As discussed above, plaintiff's complaint alleges that PBC heads and controls a RICO enterprise consisting of a group of "second-tier" pre-approved general contractors such as Harbour and "third-tier" minority/women owned subcontractors such as Optimal, as well as consultants like EDI. Accordingly, plaintiff's complaint identifies a RICO enterprise that is distinct from the defendants themselves. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) ("[O]ne must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

While Harbour concedes that plaintiff's complaint alleges that the enterprise has a common purpose, it attempts to re-characterize the alleged purpose as merely constructing buildings for the least amount to allow the contractors to realize a profit. Harbour argues that this re-casted goal cannot serve to establish a RICO enterprise because it is "the purpose of every building owner and every general contractor for every construction project." Harbour's argument, however, fails to acknowledge that plaintiff has alleged that the enterprise's goal is accomplished through fraud and extortion. Specifically, the complaint alleges that "the goal of the enterprise," is realized "through fraud and extortion . . . [to] benefit the PBC by constructing and/or renovating public buildings . . . at or below their actual construction cost while enriching both the second tier general contractors, and the third tier minority/women owned subcontractors at the expense of the bottommost project subcontractors."

The complaint also plausibly alleges relationships between the various RICO actors. Specifically, plaintiff's complaint alleges that PBC "consistently, if not exclusively, uses" EDI as a consultant when a project site presents environmental issues. The complaint further alleges that PBC and EDI agreed that EDI's environmental testing at the 12th District Project would deliberately avoid discovering the asbestos-wrapped steam lines that both parties knew were present on the property. Similarly, the complaint alleges that Harbour and PBC made a "secret agreement" to withhold payment from plaintiff for the extra costs of relocating its drill rigs, but to simultaneously represent to plaintiff that it would be paid for the work. Finally, the complaint contains factual allegations suggesting that defendants and the other RICO associates pursued the enterprise's goal from 2008 to at least 2012, and therefore sufficiently alleges longevity. These allegations plausibly allege the existence of a RICO enterprise.

Relying on Guaranteed Rate, defendants argue that in addition to alleging facts sufficient to establish the three structural features discussed in Boyle, plaintiff must also allege that each defendant had an interest in the scheme beyond their own individual interests. According to defendants, plaintiff's complaint lacks these allegations, and therefore must be dismissed. The court, however, finds no such requirement for adequately pleading the existence of a RICO enterprise.

The district court in Guaranteed Rate held that the plaintiff's complaint failed to state a claim pursuant to 1962(c) because it did not contain any factual allegations "asserting the RICO Defendants had any interest in the outcome of the alleged scheme beyond their own individual interests." Guaranteed Rate, 912 F. Supp. 2d at 687. In coming to this conclusion the district court relied on Reves v. Ernst & Young, 507 U.S. 170, 185 (1993). Id. at 687. Reves, however, does not address what allegations are necessary to allege a RICO enterprise. Instead, the Reves decision interpreted § 1962(c)'s statutory language requiring that the defendant "conduct or participate . . . in the conduct" of the enterprise's affairs. Reves, 507 U.S. at 185. Accordingly, Reves' holding that § 1962(c) "liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs," is inapposite to whether a RICO enterprise has been sufficiently pled. See id.; see also Boyle, 556 U.S. at 945 n.3 (Reves "is inapposite because that case turned on our interpretation of the participation requirement of § 1962, not the definition of 'enterprise.'"). Consequently, the court finds that plaintiff has sufficiently alleged a RICO enterprise.

### *Pattern of Racketeering Activity*

Harbour and EDI next argue that plaintiff's complaint fails to allege that defendants engaged in a pattern of racketeering activity. A "pattern of racketeering activity" is at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5). In addition to the existence of at least two predicate acts, a plaintiff "must show that the racketeering predicate [acts] are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989); see also Haynes v. City of Chicago, No. 12-C-2980, 2014 WL 5423269, at *3 (N.D. Ill. Oct. 22, 2014). This is known as the "continuity plus relationship" test. Haynes, 2014 WL 5423269 at *3. The Supreme Court has identified the existence of two types of continuity – a closed continuity, meaning a "closed period of repeated conduct" and an open-ended continuity, meaning "past conduct that by its nature projects into the future with a threat of repetition." H.J., 492 U.S. at 241.

Plaintiff has failed to identify two instances of mail or wire fraud committed by either Harbour or EDI, and therefore cannot maintain individual claims against Harbour and EDI pursuant to §§ 1962(b) and (c). Guaranteed Rate, 912 F. Supp. 2d at 684 ("In alleging a RICO pattern, liability is limited to persons who have 'personally committed' at least two predicate acts of racketeering."). Plaintiff's complaint does not identify a single mailing or wire communication sent by EDI, and therefore has not alleged that EDI engaged in a pattern of racketeering activity for purposes of individual liability under § 1962(b). Nor does plaintiff's complaint plausibly allege that EDI caused the mails to be used. United States v. Alexander, 135 F.3d 470, 474-75 (7th Cir. 1998). Moreover, because plaintiff has not alleged that EDI

25

committed any predicate act, plaintiff has also failed to sufficiently allege that its damages with respect to Count I were proximately caused by EDI. See, e.g., RWB Services, LLC v. Hartford Computer Group, Inc., 539 F.3d 681, 687 (7th Cir. 2008) ("[P]laintiff still must allege an injury resulting from one of the predicate acts.").

Plaintiff, by insufficiently alleging that Harbour committed two predicate acts, has similarly failed to establish a pattern of racketeering activity for purposes of its §§ 1962(b) and (c) claims against Harbour. Although plaintiff's complaint identifies a September 14, 2011, email sent by Harbour in furtherance of the scheme to defraud, the complaint lacks allegations of a second predicate act. Plaintiff argues in its response brief to Harbour's motion to dismiss that three other emails from Harbour constitute predicate acts.[8] However, plaintiff has not plausibly alleged how these email communications were incident to an essential part of the scheme, as opposed to normal business communications about the project. As such, Counts I and II of plaintiff's complaint do not state a claim upon which relief can be granted.

### Conspiracy - § 1962(d)

Unlike with the individual counts discussed above, in alleging that Harbour, EDI, and Dimos conspired to violate §§ 1962(b) and (c), plaintiff need not allege that each defendant actually committed two predicate acts. Id. Rather, the "touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." Goren v. New Vision Int'l, Inc., 156 F.3d 721, 732 (7th Cir. 1998).

---

[8]Specifically, plaintiff argues that an: (1) April 2011 email from Harbour notifying subcontractors about a mandatory meeting concerning the 12th District Project; (2) September 2011 email from Harbour ordering plaintiff back to work following the discovery of asbestos; and (3) October 2011 email from Harbour with an Asbestos Hazard Control Plan, qualify as wire communications incident to an essential part of the scheme to defraud.

Because a predicate act need not actually be committed, a plaintiff asserting a § 1962(d) claim does not need to "identify with particularity the two predicate acts, but only needs to allege an agreement that two predicate acts would occur." Nesbitt v. Regas, No. 13-C-8245, 2015 WL 1331291, at *17 (N.D.Ill. Mar. 20, 2015). Accordingly, to state a claim pursuant to § 1962(d) a plaintiff must allege that, "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 600 (7th Cir. 2001). EDI argues that plaintiff's complaint fails to allege that it made either agreement.[9] The court disagrees.

The complaint alleges that EDI, which was hired to complete pre-construction testing of the project site, knew about the underground obstructions – both the concrete and asbestos – prior to PBC preparing and circulating the bid and project plan documents to contractors. Specifically, plaintiff alleges that months before the CHA residential buildings were even vacated, EDI and PBC "received a site plan from the CHA showing the asbestos-wrapped steam lines." Equipped with this information, plaintiff alleges that in April 2009 PBC and EDI "agreed that EDI would do environmental test borings around the Project site looking for contaminated soil, but that the test borings would deliberately avoid coming near the underground, asbestos-wrapped steam lines." The complaint further alleges that EDI "hired a subcontractor to do an electromagnetic ('EM') analysis of the Project site." According to the complaint, although the "EM analysis recorded 36 underground 'anomalies,'" EDI and PBC "agreed that EDI would do

_____

[9]Harbour's motion to dismiss does not raise this argument.

27

test borings near only 17 of the 'anomalies'" to further conceal the existence of the asbestos-wrapped steam lines. The complaint alleges that the EM diagram generated from these tests, which was included in the project plans and bid documents PBC sent to prospective contractors, did not include any information about the asbestos-wrapped steam lines.

These allegations, combined with plaintiff's allegations that EDI: (1) was actively involved in the preparation of the project site prior to the bid documents being prepared and circulated; (2) knew about the underground obstructions prior to plaintiff receiving the bid documents indicating that there were no such obstructions; and (3) "states whatever is necessary to protect PBC's position," allow the court to reasonably infer that EDI agreed to participate in the affairs of an enterprise through a pattern of racketeering activity. Contrary to EDI's arguments that it was an outsider without any involvement in the alleged scheme, the complaint alleges that EDI was a key participant in the RICO enterprise. Had EDI not allegedly schemed with PBC to conceal the underground obstructions, plaintiff would have accounted for them when bidding on the project, or potentially would have decided not to bid on the project at all, and thus not have incurred the additional expenses from the undisclosed work that Harbour and PBC subsequently refused to pay. EDI's agreement with PBC to perform fraudulent work, therefore, is what facilitated the entire RICO scheme. In addition, Harbour's refusal to release plaintiff from the project site during the asbestos related downtime, causing plaintiff additional damages, was, according to plaintiff's allegations, facilitated by EDI's fraudulent reports of non-friable asbestos.

The court can also reasonably infer from the complaint's allegations that EDI agreed that one of the other RICO coconspirators would commit at least two predicate acts to accomplish the

enterprise's goal. As plaintiff argues, EDI was hired by PBC to complete environmental testing

on the project site prior to PBC's preparation of the project plans and bid documents. The court

can reasonably infer that EDI knew or at least that it was reasonably foreseeable that its

allegedly fraudulent work would be included in the plans and bid documents PBC would later

use to generate bids from contractors and subcontractors. Use of the mails or interstate wires in

the distribution of these documents is, of course, normal business practice. Consequently, the

court finds that plaintiff has sufficiently alleged a RICO conspiracy claim against EDI.

***Proximate Cause***

Both Harbour and EDI argue that plaintiff's RICO claims should be dismissed because

the complaint fails to adequately allege that they proximately caused plaintiff's damages.

"Section 1964(c) states that a cause of action is available to anyone 'injured . . . by reason of a

violation of section 1962." Beck v. Prupis, 529 U.S. 494, 500 (2000). Consequently, to state a

claim against Harbour and EDI under § 1962(d), plaintiff's complaint must sufficiently allege

that it was injured by reason of a conspiracy. Id.; see also DeGuelle v. Camilli, 664 F.3d 192,

205 (7th Cir. 2011) ("In order to state a claim for relief" pursuant to § 1962(d), the plaintiff

"must allege that this conspiracy proximately caused his injuries."). However, as held by the

Supreme Court in Beck, an injury caused by an overt act in furtherance of the conspiracy "that is

not an act of racketeering or otherwise wrongful under RICO, is not sufficient to give rise to a

cause of action under § 1964(c) for a violation of § 1962(d)." Beck, 529 U.S. at 505. As such, a

"plaintiff cannot bring suit under RICO based on injury caused by any act in furtherance of a

conspiracy that might have caused the plaintiff injury" but must "allege injury from an act that is

analogous to an 'act of a tortious character' . . . , meaning an act that is independently wrongful under RICO."  Id. (internal citations omitted).

Although, as discussed above, plaintiff has alleged only one predicate act committed by Harbour and none committed by EDI, the complaint alleges numerous instances of mail and wire fraud committed by PBC, a co-conspirator in the RICO enterprise.  As with all conspiracy claims, the predicate acts allegedly committed by PBC may serve as the proximate cause of plaintiff's injuries for purposes of plaintiff's § 1962(d) conspiracy claim.  See Beck, 529 U.S. at 503 (explaining that "a conspiracy claim" is "the mechanism for subjecting co-conspirators to liability when one of their member[s] committed a tortious act.").  As such, the court denies Harbour's and EDI's motions to dismiss with respect to Count III.

Plaintiff's complaint alleges that PBC was responsible for various mail and wire communications that were essential to the enterprise's fraudulent scheme.  For example, the complaint alleges that PBC's bid documents, that did not disclose the underground obstructions allegedly known to PBC at the time the documents were drafted, were emailed to plaintiff on October 12, 2010.  See Alexander, 135 F.3d at 474-75 (holding that defendant can be liable for mail fraud where he caused the mails to be used by "acting with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen" (internal quotations omitted)).  Plaintiff alleges that this communication was sent as a part of the RICO enterprise's scheme to fraudulently induce it to bid on the project at a price that did not take into account the undisclosed obstructions.

Similarly, plaintiff's complaint alleges that PBC's assistant project manager and project manager communicated via email on May 17, 2011 (an email that was subsequently forwarded

to plaintiff), "expressly authorizing [plaintiff] to relocate its drilling rigs a maximum of 2 feet in any direction in order to avoid undisclosed, underground obstructions." According to plaintiff's complaint, this communication and others were sent to induce plaintiff to perform the extra work made necessary by the undisclosed obstructions, despite Harbour's knowledge that plaintiff would never be paid for the work. These allegations are sufficient to plausibly suggest that the conspiracy led to plaintiff's injuries. See, e.g., Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

### E.     State Law Claims

Having adequately pled a federal cause of action against Harbour, the court rejects Harbour's position that the court dismiss plaintiff's state law claims for lack of jurisdiction. 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims . . ."). Harbour, however, further argues that plaintiff's unjust enrichment (Count IX) and promissory estoppel (Count X) claims should be dismissed because such relief is available only where there is no contract. According to Harbour, plaintiff alleged during the state court bond proceedings that it had an oral contract with Harbour and successfully convinced the state court of such on summary judgment. In addition, Harbour points to plaintiff's present allegations of having entered into a contract with Optimal as also barring its claims for equitable relief. Consequently, Harbour argues that "the causes of action sounding in Unjust Enrichment and [Promissory] Estoppel cannot stand." The court disagrees.

As an initial matter, the court will not consider the state court bond proceedings because they are outside the pleadings. Although a district court may take judicial notice of matters of public record, the court cannot accept Harbour's assertions regarding the state court finding as true. Harbour has not provided the court with a state court decision, or even a citation to any such decision, holding that plaintiff had an oral contract with Harbour. In addition, Harbour has not replied to plaintiff's assertion in its response brief that the state court's favorable summary judgment ruling was vacated on reconsideration. Consequently, this "adjudicated fact" is subject to reasonable dispute, and not appropriate for judicial notice. See General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997) ("A court may take judicial notice of an adjudicative fact that is both not subject to reasonable dispute and either 1) generally known within the territorial jurisdiction of the trial court or 2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." (Internal quotations omitted)).

Nor is the court persuaded that plaintiff's contract with Optimal bars plaintiff from seeking equitable relief against Harbour. "Promissory estoppel is a theory of recovery that provides a remedy 'for those who rely to their detriment, under certain circumstances, on promises, despite the absence of any mutual agreement by the parties on all the essential terms of a contract.'" Song v. PIL, LLC, 640 F.Supp.2d 1011, 1016 (N.D. Ill. 2009) (quoting Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill.2d 46 (2009)). Similarly, unjust enrichment is a quasi-contract claim that allows a court to imply a contract in order to prevent injustice. Id. at 1015. "Where a valid contract exists, a plaintiff cannot use theories like unjust enrichment and promissory estoppel . . . ." Id. at 1017. Plaintiff, however, has not alleged that it had a

contract with Harbour, from who it seeks equitable relief. Even assuming that plaintiff's contract with Optimal somehow controlled the equitable relief it can seek from Harbour, plaintiff's complaint alleges that the wrongful conduct falls outside of its contract with Optimal. Id. at 1016. Consequently, the court denies Harbour's motion to dismiss with respect to plaintiff's state law claims.

## CONCLUSION

For the foregoing reasons, plaintiff's motion (doc. 10) to disqualify Duane Morris is denied without prejudice. PBC's motion (doc. 35) to dismiss is denied. EDI's (doc. 37) and Harbour's (doc. 30) motions to dismiss are granted with respect to Counts I and II and denied with respect to Count III. Plaintiff is directed to file an amended complaint conforming to this opinion on or before July 25, 2016. The court encourages plaintiff to streamline its allegations so as to avoid some of the extraneous and unnecessary allegations that cause the current complaint to exceed 70 pages. The parties are directed to file a Joint Status Report using this court's form on or before August 8, 2016, and appear at a status hearing August 18, 2016, at 9:00 a.m.

**ENTER:** **June 28, 2016**

**Robert W. Gettleman**
**United States District Judge**