IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DT BORING, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 15 C 11222 |
| | ) Judge Robert W. Gettleman |
| THE CHICAGO PUBLIC BUILDING COMMISSION, HARBOUR CONTRACTORS, INC., an Illinois corporation, ENVIRONMENTAL DESIGN INTERNATIONAL, INC., an Illinois corporation, and JOHN DIMOS, an individual,[1] | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff DT Boring, Inc. ("DT Boring") filed a ten-count amended complaint against defendants The Chicago Public Building Commission ("PBC"), Harbour Contractors, Inc. ("Harbour"), Environmental Design International, Inc. ("EDI"), and John Dimos, alleging that Harbour, EDI, and Dimos violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), (Counts I, II, and III), PBC and Harbour engaged in common law fraud (Counts IV and V), and PBC and Harbour tortiously interfered with contractual relations (Counts VI, VII, and VIII). Plaintiff also asserts claims for unjust enrichment (Count IX) and promissory estoppel (Count X) against PBC and Harbour. Harbour filed a motion to strike certain allegations in the amended complaint and PBC filed two motions to dismiss Counts IV and VI–X of the amended complaint; one for lack of supplemental jurisdiction and one for failure to state a claim. For the reasons discussed below, the court denies all of defendants' motions.

---

[1] A summons was issued to defendant Dimos on February 4, 2016. Service, however, was never returned executed and Dimos has not filed an appearance in this matter.

## BACKGROUND[2]

### I. Procedural History

The issues and parties before the court are not new. On January 18, 2013, plaintiff filed an action in this court against essentially identical parties,[3] alleging most of the same causes of action presently before the court. See DT Boring, Inc v. Chicago Pub. Bldg. Comm'n, No. 13-C-450 ("DT Boring I"). On October 28, 2013, this court dismissed DT Boring I pursuant to Rule 12(b)(1) for lack of RICO standing because plaintiff was pursuing collateral sources of recovery. DT Boring, Inc v. Chicago Pub. Bldg. Comm'n, 2013 WL 5835703 (N.D. Ill. Oct. 28, 2013). After dismissing the RICO claim, the court declined to exercise jurisdiction over plaintiff's remaining state law claims.

Plaintiff filed its first complaint in the instant case on December 14, 2015, alleging counts nearly identical to those currently before the court. Harbour, PCB, and EDI each filed motions to dismiss for, among other things, failure to exhaust other sources of recovery, and cited this court's October 28, 2013, memorandum opinion and order in DT Boring I to support their argument. The court determined that, because plaintiff had settled its state court case, it was no longer seeking relief from another source, and that it had sufficiently pled a RICO claim under 18 U.S.C. § 1962(d). Accordingly, the court denied defendants' motions with respect to

---

[2]The following facts are taken from plaintiff's complaint and are assumed to be true for purposes of defendants' motions to dismiss. See Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995).

[3]Plaintiff's 2013 complaint named Optimal Energy, LLC, as a defendant and did not name John Dimos as a defendant. All other parties are identical.

Count III.[4]  Harbour also argued that plaintiff's RICO claims should be dismissed for failure to plead fraud with particularity, as required by Rule 9(b), and for failure to comply with Rule 8(a). The court found Harbour's arguments unconvincing and denied those motions. Plaintiff's amended complaint followed, as did the new round of defendants' motions.

## II.    Facts

Plaintiff is an Illinois corporation that consults on geothermal energy, as well as designs, drills, and installs geothermal well fields and geothermal heating and ventilation systems for governmental, commercial, and residential structures. Tom Shelton and his wife own plaintiff in joint tenancy. In October 2010, Shelton received from Optimal Energy, LLC ("Optimal") an abbreviated version of bid documents produced by defendant PBC, a municipal corporation that controls and oversees the construction and renovation of public buildings in Chicago, for construction of the 12th District Police Station in Chicago, Illinois (the "12th District Project"). Optimal subsequently sent Shelton a draft subcontractor's agreement, under which plaintiff would act as a subcontractor for Optimal on the 12th District Project, performing the drilling of 88 geothermal boreholes and other related work.

Included with the draft subcontractor agreement were revised plans for the geothermal portion of the 12th District Project taken from PBC's bid documents. The revised bid documents stated that the property on which the police station was to be built had previously contained Chicago Housing Authority ("CHA") residential buildings that had been removed from the site in 2009. In addition, the bid documents stated that "[r]emaining subsurface structures were

---

[4] The court found that plaintiff had not sufficiently pled a claim under §§ 1962(b) and (c), and granted EDI and Harbour's motions as to Counts I and II (the individual RICO counts).

removed in April 2010 [from the property] as a part of the site preparation for the construction of the 12th District Police Station." Plaintiff alleges that it relied on these statements when preparing and submitting its revised bid to Optimal. Plaintiff subsequently entered into a contract with Optimal to perform the above referenced work for the 12th District Project. Optimal in turn entered into a subcontract with defendant Harbour, which served as the general contractor for the 12th District Project.

Plaintiff alleges that the revised bid documents fraudulently asserted that the "remaining subsurface structures" from the residential housing on the project site had been removed. According to the complaint, "numerous, steel rebar-reinforced, concrete foundations from those [residential] buildings remained buried on the site several feet below grade." The complaint further alleges that "buried several feet below ground . . . were numerous asbestos-wrapped steam pipes."

Plaintiff alleges that PBC, Harbour, and EDI, which was hired to complete pre-construction environmental testing on the project site, knew about both the underground concrete obstructions and asbestos prior to PBC preparing the project's bid documents. Months before the residential housing buildings were demolished, PBC and EDI allegedly received site plans from the CHA identifying the asbestos-wrapped steam lines. The complaint alleges that in April 2009, PBC and EDI "agreed that EDI would do environmental test borings around the Project site looking for contaminated soil, but that the test borings would deliberately avoid coming near the underground, asbestos-wrapped steam lines." Plaintiff further alleges that EDI hired a subcontractor during its environmental testing that identified 36 underground anomalies during testing on the project site, and therefore recommended further testing on each anomaly. EDI and

4

PBC, however, "agreed that EDI would do test borings near only 17 of the 36 'anomalies' . . . to avoid 'discovering' the underground, asbestos-wrapped steam lines." According to the complaint, EDI, "in order to satisfy PBC, a major customer, . . . states whatever is necessary to protect PBC's position" with respect to the environmental conditions of PBC's projects.

A. **Drill Rig Relocation**

The complaint alleges that "within days" of beginning work on the 12th District Project site in May 2011, plaintiff "encountered the first of the underground steel rebar-reinforced underground obstructions." After finding the obstruction, plaintiff alleges that Shelton immediately notified Harbour's project manager, "explaining that the obstruction had not been disclosed on any of the bid documents given to Shelton." Plaintiff alleges that an "on-site meeting" between Harbour, PBC, and plaintiff then occurred, during which Harbour and PBC agreed to have plaintiff "relocate its drilling rigs anywhere within a 2-foot radius of the original, specified location for the borehole."

According to the complaint, the day after the on-site meeting, Shelton spoke with PBC's assistant project manager Andy Horn, who inquired about how much it would cost PBC for plaintiff to relocate its drilling rigs when it encountered the previously undisclosed underground obstructions. Shelton told Horn that plaintiff would charge a flat three hours of time at a cost of $1,650 for each drill rig plaintiff had to relocate, plus the additional cost of removing excess soil. Horn allegedly agreed to pay plaintiff at this rate. The complaint alleges that on May 26, 2011, "Shelton received an email over the interstate wires that contained another email, also sent over the interstate wires, dated May 17th, 2011, and sent from Horn to [James] Harrell [PBC's project manager], and other PBC staff members expressly authorizing [plaintiff] to relocate its drilling

5

rigs a maximum of 2 feet in any direction in order to avoid undisclosed, underground obstructions."

Plaintiff alleges that in early June 2011 Shelton inquired with Harbour's project manager, Sam Rae, as to why plaintiff had not received written field orders from Harbour for the drill rig relocations. Rae allegedly informed Shelton that "Harbour had not issued any Field Orders because Harbour had to 'package' [plaintiff's] drill rig relocation costs as change orders with other subcontractors' change orders, before submitting them all to the PBC for payment." According to the complaint, "Rae told Shelton again that [plaintiff] would be paid for its drill rig relocation costs, and he also told Shelton to have [plaintiff] continue with its work including relocating the drill rigs when necessary." As a result, plaintiff alleges that it continued drilling the remaining 88 boreholes for the 12th District Project.

The complaint alleges that PBC's and Harbour's statements to plaintiff orally authorizing the drill relocation and agreeing to pay plaintiff for the extra work "were all intentionally false and fraudulent when made." Plaintiff alleges that the statements were intended to induce it to continue drilling the boreholes, but that PBC and Harbour had no intention of paying for the work. According to the complaint, "Rae, on behalf of Harbour, and Harrell, on behalf of the PBC, had already made a secret agreement [that] when [plaintiff] encountered the first of the undisclosed, underground obstructions that the PBC and Harbour would deliberately withhold all payments for [plaintiff's] drill rig relocations until [plaintiff] had completed all of its work on the geothermal portion of the Project . . . in the hope that no payment would be necessary because of a credit owed to PBC by Optimal." Plaintiff alleges that "Harbour and the PBC hoped that

6

Optimal's credit owed to the PBC would fully offset the amount owed to [plaintiff] for the drill rig relocations so that the PBC would not have to pay [plaintiff] anything" for the extra work.

Unaware of this agreement, plaintiff alleges that it continued to submit timely invoices for the extra work to Optimal as directed by Rae. "In reality, Rae and Harbour directed [plaintiff] to submit its invoices to Optimal for transmission to Harbour simply to ensure that payments for [plaintiff's] drill rig relocation costs had to pass through Optimal so that those payments could be offset by Optimal's credit owed to the PBC." The complaint alleges that into September 2011 Harbour continued to assure plaintiff that it would be paid for the extra work, but that it was still "packaging" plaintiff's change orders. Specifically, plaintiff alleges that Rae sent Shelton an email on September 14, 2011, stating that "Harbour was waiting for the necessary backup and documentation for each change order," and that it was "Harbour's opinion that the additional work was performed, and that the PBC was aware that the work was taking place." These statements, plaintiff alleges, were made "to fraudulently induce [it] to continue working on the Project."

According to the complaint, plaintiff's additional costs associated with the undisclosed obstructions "quickly exceeded the amount of any credit that Optimal owed to the PBC." As a result, plaintiff alleges that Harbour began submitting the change orders to PBC, that were then rejected "with a 'wink and a nod' as 'insufficient.'" The complaint alleges, however, that on September 21, 2011, during a meeting at Harbour's headquarters with Harbour project executive Mark Karaskiewicz, Rae, and two principals from Optimal, Rae "expressly stated that the change orders had been 'approved' by Harrell and were being sent downtown to the PBC for 'final approval' and payment."

### B. Asbestos-Related Downtime

The complaint alleges that in August 2011, while working on the trenches, Shelton discovered a large pipe encased in wrapping that was later determined might be asbestos. EDI was subsequently called to the site to examine the piping insulation, concluding before samples were sent to the lab that the asbestos was non-friable, meaning that it could not move through the air, and therefore was not dangerous. The area where the pipe was located was cordoned off and plaintiff was ordered to resume work in a different area of the project. Because only limited work could be completed in that area, plaintiff alleges that with the exception of Shelton, all of its crew "had to stand idle."

On September 1, 2011, Optimal personnel examined the trenches in which plaintiff's employees had been working for several weeks, and concluded that they too might contain asbestos. Plaintiff alleges that Optimal issued a formal Notice of Delay, halting plaintiff's work on the project. EDI, however, once again declared that the asbestos was non-friable, informing Harbour, Optimal, and plaintiff that work on the trenches could continue if plaintiff's employees worked downwind. Harbour issued a formal back to work order on September 2, 2011.

Plaintiff alleges that on September 9, 2011, the Occupational Safety and Health Administration ("OSHA") conducted a site visit and concluded that friable asbestos was present in significant quantities on the project site. That same day, Optimal received test results from samples it had taken, which also showed the presence of friable asbestos. The complaint alleges that Optimal issued a stop work order that day. Harbour subsequently "agreed that the stop work order could remain in effect until [ ] abatement measures had been taken to remove the asbestos-contaminated soil." Following the stop work order, plaintiff alleges that "Shelton repeatedly told

Harbour – and specifically Karaskiewicz – that, because [plaintiff] had not been released from the Project, [it] had to continue paying its employees even while they were unable to work."

According to the complaint, during a September 21, 2011, meeting at Harbour's headquarters, Karaskiewicz inquired about plaintiff's per diem costs resulting from Harbour's decision not to release it from the project. Shelton allegedly reported that it cost plaintiff approximately $4,200 per day to have its employees and equipment sit idle, which plaintiff alleges Harbour subsequently agreed to pay. The complaint alleges that plaintiff's employees and equipment sat idle from September through November 18, 2011, at which time plaintiff was terminated from the project. Plaintiff alleges that defendants continued to fraudulently represent, as late as January 26, 2012, that it would be paid for its extra work and down-time related to the undisclosed obstructions.

### C.    RICO Scheme

The complaint alleges that neither Harbour nor PBC has ever paid plaintiff for the money owed to it for the extra work associated with the undisclosed underground obstructions or asbestos-related downtime. As a result of the non-payment, plaintiff alleges that its working capital was exhausted and it was forced out of business. Plaintiff alleges that defendants' actions on the 12th District Project were consistent with a greater fraudulent scheme perpetrated by defendants. Specifically, the complaint alleges that PBC heads and controls a RICO enterprise made up of a group of "second-tier" pre-approved general contractors such as Harbour and "third-tier" minority/women owned subcontractors such as Optimal, as well as consultants like EDI. According to the complaint, "the goal of the enterprise, through fraud and extortion, is to benefit the PBC by constructing and/or renovating public buildings . . . at or below their actual

9

construction cost while enriching both the second tier general contractors, and the third tier minority/women owned subcontractors at the expense of the bottommost project subcontractors."

The process by which the enterprise allegedly accomplishes this goal begins with PBC requesting project bids from a group of general contractors, including those that are a part of the RICO enterprise. The general contractors subsequently request preliminary bids from the third-tier minority/women owned subcontractors, also a part of the enterprise, who in turn request bids from the lower-tier subcontractors, such as plaintiff. The lower-tier subcontractors then submit their bids, with a reasonable profit margin, to the third-tier subcontractors. The second-tier general contractor, however, demands that the lower-tier subcontractors reduce their bids in order to be included in the general contractor's overall bid to PBC. The lower-tier subcontractors do so by eliminating their own profit margins. The general contractor subsequently submits its overall proposed bid to PBC, fraudulently leaving out its own profit margin to ensure that it is the lowest bidder.

Plaintiff alleges that once PBC awards the project to the RICO enterprise general contractor, the general contractor is tasked with both ensuring that the project is completed at or below the actual construction cost so as to benefit PBC and regaining its own profit margins that were intentionally omitted from its bid. To accomplish this, plaintiff alleges that the general contractor extorts funds and performance from the lower-tier subcontractors by: (a) "refusing to process change orders approving work performed outside the scope of the original contracts and subcontracts so that PBC gets the benefit of additional work and materials for free"; (b) "trumping up phony 'back charges' for the subcontractor's purportedly defective work so the general contractor can withhold the amount of those fraudulent back charges"; (c) "refusing to

10

pay the subcontractor at all"; and/or (d) "agreeing to pay the retainage, change orders and/or amounts due, but only if the subcontractor agrees to a 'buyout' which is a reduction in the amount owed to the subcontractor."

## DISCUSSION

### I. Motions to Dismiss

PBC has filed two motions to dismiss Counts IV and VI through X; a motion pursuant to Rule 12(b)(6), and a motion for lack of supplemental jurisdiction. Although the pleadings are lengthy and complex, they boil down to one question: whether plaintiff has sufficiently stated its claim of fraud against PBC. The court answers that question in the affirmative.

### A. Rule 12(b)(6)

When ruling on a Rule 12(b)(6) motion to dismiss, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. Sprint Spectrum L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1001 (7th Cir. 2004). The pleading must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which the claim rests. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level." Id.

This standard demands that a complaint allege more than legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

11

The crux of PBC's motion to dismiss Count IV (common law fraud) is that, "PBC expressly retained [contractual] liability for unforeseen underground conditions, making the alleged fraud impossible." According to PBC, that contractual liability means that it "could not gain even if it concealed the underground conditions and as a matter of law imposed no detriment on the plaintiff." The fatal flaw in PBC's argument is that it assumes that PBC intended to honor its contractual obligations. This argument ignores plaintiff's allegations that it was fraudulently induced to enter into the contract, and that PBC and Harbour deliberately and fraudulently prevented plaintiff from exercising its contractual rights that PBC and Harbour had no intention to honor.

PBC urges the court to follow the reasoning of the Circuit Court of Cook County when it decided Harbour Contractors, Inc. v. Public Building Commission of Chicago, 2014 CH 16728, and find that the contract terms that impose liability on PBC for costs associated with unforeseen underground conditions make the alleged fraud legally and factually impossible.[5] The court declines to do so. In Harbour Contractors, Harbour alleged that PBC knew about the underground obstructions, but intentionally concealed that knowledge from Harbour, which caused Harbour to incur substantial construction costs beyond those it considered when it submitted its bid to PBC for the 12th District Project. There, the court reasoned that there could be no fraud because PBC accepted liability for costs associated with unforseen underground conditions, even if PBC intentionally concealed them. Regardless of whether the circuit court's

---

[5] Plaintiff argues that the court should convert PBC's Rule 12(b)(6) motion into a Rule 56 Summary Judgment motion because PBC attached documents associated with the circuit court litigation and excerpts of several contracts to its motion. Because the court need not consult those documents in denying PBC's motion, it will not address plaintiff's argument.

reasoning was sound, its decision is inapposite. In the instant case, plaintiff alleges not just that PBC intentionally and fraudulently concealed the underground obstructions. Plaintiff also alleges that PBC did so as part of a large conspiracy, along with Harbour, to fraudulently induce low-tier subcontractors like plaintiff into submitting artificially low bids, and ultimately doing the "unforeseen" work, all the while knowing that PBC and Harbour had no intention of paying the subcontractors for it. Given that plaintiff's fraud claim is premised on its allegations that PBC entered into the contract intending to defraud plaintiff, PBC's argument that Count IV should be dismissed due to plaintiff's ability to pursue damages through its contractual remedies is unavailing.

Putting the issues presented to the circuit court aside, plaintiff has sufficiently pled a fraud claim against PBC. Rule 9(b) requires a plaintiff alleging fraud to satisfy heightened pleading standards, answering the "who, what, when, where, and how of the fraud." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014). The complaint alleges that PBC, along with the other defendants, knew about the underground concrete obstructions on the 12th District Project site prior to plaintiff beginning its work. Specifically, PBC allegedly revised bid documents to include the following false statement: "[r]emaining subsurface structures were removed in April 2010 as part of the site preparation work for the construction of the 12th District Police Station." Plaintiff further alleges that PBC knew that steel rebar-reinforced concrete foundations and asbestos-wrapped pipes remained buried several feet below ground, and that PBC revised the bid documents so that plaintiff would submit an artificially low bid for the work that it would do on the project. Defendants, including PBC, allegedly knew these obstructions would require additional work from plaintiff. Plaintiff further alleges that PBC induced this

13

extra work from plaintiff through false representations that plaintiff would be paid for the work, knowing that it would not. The heightened standard that Rule 9(b) demands is met in the instant case.

PBC's argument that Counts VI through X should be dismissed is hinged entirely on whether the court dismisses Count IV. Because the court declines to do so, PBC's motion to dismiss for failure to state a claim is denied in its entirety.

### B. Supplemental Jurisdiction

PBC also argues that plaintiff's claims against PBC should be dismissed for lack of supplemental jurisdiction because plaintiff (correctly) does not assert a RICO claim against PBC. According to PBC, the fact that plaintiff has not alleged a RICO claim against PBC means that "[t]he Illinois courts are better equipped to handle the plaintiff's claims against the PBC." The court disagrees.

As plaintiff points out, and PBC acknowledges, the reason plaintiff has not asserted a RICO claim against PBC is that PBC, a municipal corporation, is immune from civil claims under the RICO Act. See Reyes v. City of Chicago, 585 F. Supp. 2d 1010, 1014 (N.D. Ill. 2008); Pelfresne v. Vill. of Rosemont, 22 F. Supp. 2d 756, 761 (N.D. Ill. 1998). Nevertheless, PBC argues that the state law claims outnumber and outweigh the federal claims, to which it is not a party. Although the RICO claims may be outnumbered by the state claims, they are certainly not outweighed and, in fact, all of the claims "derive from a commun nucleus of operative fact." Menard v. City of Chicago, 1999 WL 608716 at *1 (N.D.Ill. Aug. 5, 1999) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)). Further, all of plaintiff's claims arise out of the same incidents "and would be expected to be tried in the same case." Id.

14

The evidence required to prove the RICO claim is largely the very same evidence that would be required to prove the state law claims. And, as PBC recognizes, "supplemental jurisdiction is a doctrine of discretion." Id. at *2. The court declines PBC's invitation to exercise that discretion to dismiss plaintiff's state law claims against it. Accordingly, PBC's motion is denied.

## II. Motion to Strike

Harbour has moved to strike certain allegations in plaintiff's amended complaint because they are: (1) wholly immaterial to the present litigation, scandalous and prejudicial to Harbour, or (2) improperly pled with respect to claims of fraud. As for the second argument, Harbour acknowledges that the court already rejected it in its June 28, 2016, memorandum opinion and order. See DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n, 2016 WL 3580756 (N.D. Ill. June 28, 2016). This time around, Harbour attacks plaintiff's claims made "on information and belief," arguing that the Seventh Circuit has held that such claims generally do not satisfy the heightened pleading standard of Rule 9(b). Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 948 (7th Cir. 2013). But, as Harbour points out, allegations of fraud based "on information and belief" are permissible when: "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 443 (7th Cir. 2011). The amended complaint meets those requirements.

Harbour attempts to support its motion by citing to this court's June 28, 2016, opinion, which found that detailed allegations that certain Harbour employees made statements on certain dates satisfied the heightened pleading requirements. It was not, as Harbour appears to argue, implicit in that ruling that any allegations that were not specifically mentioned by the court

would not satisfy the heightened pleading requirements. Indeed, the allegations that Harbour now objects to were alleged in the first complaint, for the most part verbatim, but were not attacked by Harbour in its previous motion. The court declines to give Harbour a second bite at the Rule 9(b) apple. Its motion based on those grounds is denied.

The court also rejects Harbour's argument that certain allegations in plaintiff's amended complaint are immaterial, scandalous, and prejudicial. First, much as with Harbour's Rule 9(b) argument, the allegations that it now objects to were included, for the most part verbatim, in the first complaint. It is unclear to the court why Harbour failed to object to them in its first motion to dismiss. That aside, the court does not find that the complaint, though verbose, is intended to confuse the matters at issue, as Harbour alleges.

First, Harbour is mistaken when it claims that the only allegations relevant to this litigation are those that relate to the construction of the 12th District Police Station. Harbour's mistake is premised on its claim that the amended complaint "repeatedly alleges that the 12th District Project is the only project at issue in this dispute" (emphasis in original). However, Harbour's references to the amended complaint do not support this contention, but rather highlight plaintiff's claim of a long-standing RICO enterprise. If plaintiff's allegations were, in fact, limited to the 12th District Project, the paragraphs Harbour objects to could very well be considered immaterial, scandalous, and prejudicial. Plaintiff's allegations are not so limited. Plaintiff alleges a much broader swath of misconduct than that which allegedly occurred during the 12th District Project. The amended complaint, though lengthy, is understandably so considering the allegations it contains. See Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 2010 WL 1979569, at *5 (N.D. Ill. May 17, 2010) ("In complex cases like the

RICO [ ] claims at issue here, a fuller set of factual allegations may be necessary to show that the plaintiff's claim is not largely groundless.") (internal quotation omitted).[6]

Second, the court finds that plaintiff has largely followed its order "to streamline its allegations so as to avoid some of the extraneous and unnecessary allegations." Plaintiff has managed to cut a substantial number of pages, and extraneous allegations, such that the "unnecessary clutter" has been removed to properly frame the issues of the case. Because the court finds that the allegations in the Amended Complaint are not immaterial, scandalous, or prejudicial, Harbour's Motion to Strike is denied.

## CONCLUSION

For the foregoing reasons, PBC's motions to dismiss (docs. 73 and 76) are denied. Harbour's motion to strike (doc. 78) is denied. Defendants are directed to answer the amended complaint on or before April 5, 2017. The parties are ordered to submit a joint status report on this court's form on or before April 12, 2017. This matter is set for a report on status on April 20, 2017, at 9:00 a.m.

**ENTER:** March 8, 2017

_____
**Robert W. Gettleman
United States District Judge**

---

[6] Additionally, this court found that plaintiff's original complaint, which was nearly twenty pages longer than its amended complaint, complied with FRCP 8(a). DT Boring, Inc., 2016 WL 3580756, at *9 n.7.